# Supreme Court of Florida

_____

No. SC18-1287
_____

**DEPARTMENT OF STATE, etc., et al.,**
Appellants,

vs.

**FLORIDA GREYHOUND ASSOCIATION, INC., etc., et al.,**
Appellees.

September 7, 2018

PER CURIAM.

Appellants, the Florida Department of State and Secretary of State Ken Detzner, seek review of the judgment of the Circuit Court for the Second Judicial Circuit in *Florida Greyhound Association v. Department of State*, No. 2018-CA-1114 (Fla. 2d Cir. Ct. Aug. 1, 2018). In that decision, the circuit court held the ballot title and summary of a proposed amendment to the Florida Constitution ("Amendment 13") were clearly and conclusively defective. The circuit court granted summary judgment for Appellees, Florida Greyhound Association, Inc., and James Blanchard, and entered an injunction forbidding Amendment 13 from appearing on the November 2018 general election ballot. Appellants appealed to

the First District Court of Appeal.  The district court certified that this case is of great public importance and requires immediate resolution by this Court.  We have jurisdiction.  *See* art. V, § 3(b)(5), Fla. Const.  As explained below, we reverse the judgment of the circuit court, vacate the injunction, and order that Amendment 13 shall appear on the November 2018 general election ballot.

## Background

The Florida Constitution establishes a Constitution Revision Commission ("CRC"), which convenes every twenty years.  Art. XI, § 2(a), Fla. Const.  As its name suggests, the mandate of the CRC is to examine the Florida Constitution, hold public hearings, and propose changes or additions to any part of the Florida Constitution it determines to be in need of revision.  *Id.* § 2(c).  The CRC submits its proposed revisions to the Secretary of State, who then authorizes the proposed revisions to be placed on the ballot at the next general election for voter approval.  Art. XI, § 5(a), Fla. Const.  Florida law provides:

> Whenever a constitutional amendment . . . is submitted to the vote of the people, a ballot summary of such amendment . . . shall be printed in clear and unambiguous language on the ballot . . . .  The ballot summary of the amendment . . . and the ballot title to appear on the ballot shall be embodied in the constitutional revision commission proposal . . . or enabling resolution or ordinance.  The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.

§ 101.161(1), Fla. Stat. (2018); *see also Armstrong v. Harris*, 773 So. 2d 7, 12 (Fla. 2000) (explaining that section 101.161 codifies the "accuracy requirement" implicit in Article XI, section 5 of the Florida Constitution).  This subsection also provides that "[t]he ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of." § 101.161(1), Fla. Stat. (2018).

On May 9, 2018, the 2017-18 CRC submitted its final report to the Secretary of State, including several proposed amendments for inclusion on the November 2018 general election ballot.  Among these proposed amendments was Amendment 13.  If approved by the voters, Amendment 13 would add two new sections to the Florida Constitution.  First, Amendment 13 would add the following section to Article X:

> Prohibition on racing of and wagering on greyhounds or other dogs.-
> The humane treatment of animals is a fundamental value of the people of the State of Florida.  After December 31, 2020, a person authorized to conduct gaming or pari-mutuel operations may not race greyhounds or any member of the *Canis Familiaris* subspecies in connection with any wager for money or any other thing of value in this state, and persons in this state may not wager money or any other thing of value on the outcome of a live dog race occurring in this state.  The failure to conduct greyhound racing or wagering on greyhound racing after December 31, 2018, does not constitute grounds to revoke or deny renewal of other related gaming licenses held by a person who is a licensed greyhound permitholder on January 1, 2018, and does not affect the eligibility of such permitholder, or such permitholder's facility, to conduct other pari-mutuel activities authorized by general law.  By general law, the legislature shall specify civil or criminal

penalties for violations of this section and for activities that aid or abet violations of this section.

Const. Revision Comm'n 2017-18 Final Report at 47-48 (underlining omitted).

Second, Amendment 13 would add the following section to Article XII:

Prohibition on racing of or wagering on greyhounds or other dogs.- The amendment to Article X, which prohibits the racing of or wagering on greyhound[s] and other dogs, and the creation of this section, shall take effect upon the approval of the electors.

*Id.* at 48 (underlining omitted). As required by section 101.161(1), Florida Statutes, the CRC's report also includes the language to appear on the ballot describing Amendment 13, which reads as follows:

CONSTITUTIONAL AMENDMENT
ARTICLE X, NEW SECTION
ARTICLE XII, NEW SECTION

ENDS DOG RACING.-Phases out commercial dog racing in connection with wagering by 2020. Other gaming activities are not affected.

*Id.*

Appellees filed suit in the circuit court on May 17, 2018, arguing that Amendment 13's ballot language was defective and should be stricken from the ballot. The circuit court agreed, holding that Amendment 13's ballot language "misstates certain facts as to what the Amendment will do, and neglects to give voters crucial information about the actual chief effects of what the CRC was trying to accomplish, thus violating the Constitutional and statutory 'truth in

- 4 -

packaging' requirements." *Fla. Greyhound Ass'n*, No. 2018-CA-1114, slip op. at 24-25. The circuit court reasoned that Amendment 13 had two chief purposes: recognizing the humane treatment of animals as a fundamental value; and allowing pari-mutuel facilities which currently operate cardrooms or slot machines on the basis of their dog-racing permits to continue to operate those cardrooms and slot machines without conducting the statutorily required dog racing. *Id.* at 17-23. The circuit court reached this conclusion based on its perception of the CRC's subjective intent with respect to Amendment 13, as expressed by members of the CRC during floor debate of Amendment 13. *Id.* The circuit court also explained that Amendment 13's "decoupling" of slot machine and cardroom operations from existing requirements to conduct dog racing has "an actual effect on other gaming activities" and on the existing constitutional provisions which regulate those activities, especially Article X, section 23 of the Florida Constitution. *Id.* at 21-23. Therefore, the circuit court held, the failure to disclose these "fundamental value" and "decoupling" provisions on the ballot rendered Amendment 13's ballot language "clearly and conclusively defective." *Id.* at 15.

The circuit court also concluded that the ballot language of Amendment 13 was misleading, and therefore defective, because it claims Amendment 13 "prohibits more activity than it, in fact, does." *Id.* at 16. The circuit court reasoned that the ballot title "ENDS DOG RACING" would lead voters to believe that

Amendment 13 prohibits all racing of all dogs, although Amendment 13 would only prohibit "persons authorized to conduct gaming or pari-mutuel operations from the racing of greyhounds, or any other dog, in connection with wagering on the outcome of said race." *Id.* Furthermore, the circuit court stated, the ballot language failed to inform voters "that wagering on the outcome of dog races which take place outside the State of Florida will not be affected." *Id.* at 17. Therefore, the circuit court concluded, the ballot language would mislead voters about the scope of conduct Amendment 13 would regulate. *Id.*

**Standard of Review**

The issue of whether the ballot language describing a proposed constitutional amendment is deficient presents a pure question of law which we review de novo. *Armstrong*, 773 So. 2d at 11. If the ballot language does not satisfy the requirements of the law, we cannot rewrite it to correct its flaws: the only remedy is for the proposed amendment to be stricken from the ballot. *Smith v. Am. Airlines, Inc.*, 606 So. 2d 618, 621-22 (Fla. 1992). Therefore, we "must exercise extreme caution and restraint before removing a constitutional amendment from Florida voters." *Fla. Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008). "In order for a court to interfere with the right of the people to vote on a proposed constitutional amendment[,] the record must show that the proposal is

- 6 -

clearly and conclusively defective." *Askew v. Firestone*, 421 So. 2d 151, 154 (Fla. 1982).

Florida law requires the ballot language to give the voters "fair notice" of the decision they must make. *Miami Dolphins, Ltd. v. Metropolitan Dade Cty.*, 394 So. 2d 981, 987 (Fla. 1981). In terms of a ballot title and summary, fair notice "must be actual notice consisting of a clear and unambiguous explanation of a measure's chief purpose." *Askew*, 421 So. 2d at 156. To evaluate whether a proposed amendment's ballot language is clearly and conclusively defective, the Court considers two questions: first, "whether the ballot title and summary fairly inform the voter of the chief purpose of the amendment," and second, "whether the language of the ballot title and summary misleads the public." *Advisory Op. to Att'y Gen. re Rights of Elec. Consumers Regarding Solar Energy Choice*, 188 So. 3d 822, 831 (Fla. 2016).[1] Ballot language may be clearly and conclusively defective either in an affirmative sense, because it misleads the voters as to the material effects of the amendment, or in a negative sense by failing to inform the voters of those material effects. *See Armstrong*, 773 So. 2d at 21 (concluding that "the ballot language in the present case is defective for what it does *not* say");

---

1. "[T]he wisdom of a proposed amendment is not a matter for our review." *Askew*, 421 So. 2d at 155. Therefore, our decision to approve or disapprove a proposed amendment's ballot language should not be construed as approval or disapproval of its substance.

*Advisory Op. to Att'y Gen. re Term Limits Pledge*, 718 So. 2d 798, 803 (Fla. 1998) (striking a proposed amendment which "would substantially impact" the powers of the Secretary of State when the ballot language "simply state[d] that the proposed amendment *affects* the powers of the Secretary of State").

When evaluating whether a proposed amendment's ballot language is clearly and conclusively defective, "a court must look not to subjective criteria espoused by the amendment's sponsor but to objective criteria inherent in the amendment itself, such as the amendment's main effect." *Armstrong*, 773 So. 2d at 18. We read the ballot title and summary as a single text to determine what a reasonable voter would understand it to say. *Advisory Op. to the Att'y Gen. re Florida's Amend. to Reduce Class Size*, 816 So. 2d 580, 585 (Fla. 2002) (explaining that the ballot title and summary "must be read together in determining whether the ballot information properly informs the voters"). Although the polestar of our analysis is the candor and accuracy with which the ballot language informs the voters of a proposed amendment's effects, we have also recognized "that voters may be presumed to have the ability to reason and draw logical conclusions" from the information they are given. *Smith*, 606 So. 2d at 621; *see also Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694, 701 (Fla. 2010) ("This Court presumes that the average voter has a certain amount of common understanding and knowledge."). Because of this, ballot language "is not required to explain every detail or

- 8 -

ramification of the proposed amendment." *Smith*, 606 So. 2d at 620. However, the notoriety of a proposed amendment and the media attention given to it do not excuse a proposed amendment's ballot language from compliance with the law. *See Askew*, 421 So. 2d at 156 (explaining that sponsors of a proposed amendment have "[t]he burden of informing the public" through the ballot title and summary).

**Analysis**

This case presents three issues for our consideration. First, we must evaluate whether Amendment 13's ballot language is clearly and conclusively defective because it fails to inform the voters that adoption of Amendment 13 would recognize the humane treatment of animals as a fundamental value. Second, we must analyze whether the ballot language misstates the effect of Amendment 13 on other forms of gaming, and is therefore defective. Finally, we must determine whether the ballot language is misleading because it fails to disclose that adoption of Amendment 13 would not end all racing of dogs and would allow wagering on out-of-state races to continue. We address each of these issues in turn.

*I. Fundamental Value*

If approved by the voters, Amendment 13 would recognize "the humane treatment of animals" as a "fundamental value of the people of the State of Florida." Amendment 13's ballot language does not inform voters of this provision, and the circuit court concluded that this omission rendered the ballot

- 9 -

language clearly and conclusively defective. Appellants argue that the ballot language was not required to disclose this provision to the voters because it is prefatory.

When considering whether ballot language is clearly and conclusively defective, a reviewing court analyzes the text of a proposed amendment to determine its legal significance, and identifies the proposed amendment's chief purpose based on the results of that analysis. *See Armstrong*, 773 So. 2d at 18 (determining the chief purpose of the relevant amendment by analyzing its "main effect"); *Smith*, 606 So. 2d at 620 (striking an amendment where the ballot language "[told] the voter nothing about the actual change to be effected"). It follows that any provision of a proposed amendment which has no legal effect cannot be its chief purpose. Instead, provisions which lack legal significance are considered prefatory. *See Massey v. David*, 979 So. 2d 931, 939 (Fla. 2008) (holding certain statutory terms were prefatory because they "d[id] not actually define a substantive right").

We follow "principles parallel to those of statutory interpretation when reviewing issues related to constitutional provisions." *Slough*, 992 So. 2d at 148. Although prefatory language may aid a court to determine legislative intent when the operative terms of a provision of law are ambiguous, such language does not control interpretation of the operative terms of that provision. *See Dorsey v. State*,

- 10 -

402 So. 2d 1178, 1180 (Fla. 1981) (noting that the law "is well settled that such 'prefatory language' cannot expand or restrict the otherwise unambiguous language of a statute").

Amendment 13's fundamental value provision is devoid of any legislative or judicial mandate: it bestows no rights, imposes no duties, and does not empower the Legislature to take any action. Furthermore, it is well settled that the Florida Constitution permits the Legislature to impose civil and criminal penalties for inhumane treatment of animals. *See Porter v. Vinzant*, 38 So. 607, 608 (Fla. 1905) (holding that the general powers delegated by the Legislature to the City of Jacksonville included the power to adopt an ordinance prohibiting cruelty to animals). Irrespective of whether the CRC intended Amendment 13's fundamental value provision to have independent legal effect, it manifestly does not. *See Armstrong*, 773 So. 2d at 18 (explaining that a proposed amendment is analyzed on the basis of "objective criteria inherent in the amendment itself" and not "subjective criteria espoused by the amendment's sponsor").

Appellees compare the fundamental value provision of Amendment 13 to similar provisions of Article IX, section 1(a) and Article X, section 21 of the Florida Constitution. The relevant portions of these sections provide that "education of children is a fundamental value of the people of State of Florida," Art. IX, § 1(a), Fla. Const., and that "[i]nhumane treatment of animals is a concern

- 11 -

of Florida citizens." Art. X, § 21, Fla. Const. Appellees argue that, because the ballot language describing those amendments informed voters that approval of those measures would recognize education as a "fundamental value" and inhumane treatment of animals as a "concern," respectively, Amendment 13's ballot language must also disclose its recognition of a fundamental value. *See Advisory Op. to the Att'y Gen. re Limiting Cruel and Inhumane Confinement of Pigs During Pregnancy*, 815 So. 2d 597, 597 (Fla. 2002) (quoting ballot language); *see also* 30 J. of the 1997-1998 Const. Revision Comm'n 250 (May 5, 1998), *available at* http://fall.fsulawrc.com/crc/journal/index.html (text of ballot language describing Article IX, section 1(a)).

This argument lacks merit. Although the drafters of those amendments did inform voters of the provisions in question by disclosing them in the ballot language describing those amendments, we have never held that they were required to do so. Appellees cite no case actually interpreting the substance of either provision or applying them to adjudicate a party's rights or duties. The relevant amendment to Article IX, section 1(a) was not challenged in court, and our Advisory Opinion regarding Article X, section 21 did not discuss whether disclosure of the provision in question was necessary. *See generally Confinement of Pigs*, 815 So. 2d at 599-600. Furthermore, the comparison to Article IX, section 1(a) is unavailing. Although that subsection begins by recognizing the education

of children as a fundamental value, it continues: "It is, *therefore*, a paramount duty of the state to make adequate provision for the education of all children residing within its borders." Art. IX, § 1(a), Fla. Const. (emphasis added). Unlike the fundamental value provision in Amendment 13, which is freestanding, the fundamental value provision in Article IX, section 1(a) is explicitly linked to the provisions that follow it. Irrespective of whether the fundamental value provision of Article IX, section 1(a) contributes to the creation of a private cause of action—an issue which is not before us in this case, and about which we express no opinion—it is evident that the fundamental value provision of Amendment 13 does not do so.

Because the fundamental value provision does not have any independent legal significance, we conclude it is prefatory and that its omission from the ballot summary does not render the ballot language clearly and conclusively defective. We therefore conclude the circuit court erred when it held the ballot language was clearly and conclusively defective for failing to inform the voters that approval of Amendment 13 would recognize the humane treatment of animals as a fundamental value.

## II. Other Forms of Gaming

The circuit court also determined Amendment 13's ballot language was clearly and conclusively defective because, the circuit court reasoned, it would

- 13 -

mislead voters about the effects Amendment 13 would have on other forms of gaming. Specifically, the circuit court concluded the ballot language failed to inform voters that Amendment 13 would materially affect Article X, section 23 of the Florida Constitution. The circuit court further concluded that, contrary to the ballot language's claim that other forms of gaming would not be affected, Amendment 13 would affect other forms of gaming by doing away with the requirement that cardrooms and slot machine facilities whose licenses are based on underlying dog-racing permits continue to conduct dog races.

"A ballot summary may be defective if it omits material facts necessary to make the summary not misleading." *Advisory Op. to the Att'y Gen.—Ltd. Political Terms in Certain Elective Offices*, 592 So. 2d 225, 228 (Fla. 1991). A ballot summary is not required to affirmatively advise the electorate that the proposed amendment it describes would not modify any current constitutional provision, but a ballot summary must not conceal a conflict between the proposed amendment and an existing constitutional provision. *See Slough*, 992 So. 2d at 147-48. It is not always necessary for a ballot summary to state which provisions of the Florida Constitution would see their effects altered by the proposed amendment. *See Advisory Op. to the Att'y Gen. re Tax Limitation*, 673 So. 2d 864, 868 (Fla. 1996). A ballot summary also is not per se defective because it fails to advise voters of exceptions to the mandate of the proposed amendment, provided the ballot

language is not otherwise misleading. *See Reduce Class Size*, 816 So. 2d at 585-86 (holding that the relevant ballot language was not defective for failing to inform voters of an exception for "extracurricular classes"). A ballot summary may not, however, fail to inform the voters of the repeal of an existing constitutional provision. *See Advisory Op. to the Att'y Gen. re 1.35% Prop. Tax Cap, Unless Voter Approved*, 2 So. 3d 968, 976 (Fla. 2009) (holding ballot language was misleading because it did not "inform the voter of the repeal of an existing constitutional provision").

We conclude Amendment 13 would have no effect on any existing provision of the Florida Constitution. Article X, section 23 of the Florida Constitution authorizes Broward and Miami-Dade Counties to conduct referenda in order to authorize the operation of slot machines "within existing, licensed pari[-]mutuel facilities . . . that have conducted live racing or [jai alai] games in that county during each of the last two calendar years before the effective date of this amendment." Art. X, § 23(a), Fla Const. Because that amendment became effective in 2004, its effect is to authorize Broward and Miami-Dade Counties to approve slot machine operations at pari-mutuel facilities which conducted racing or games in 2002 and 2003. Article X, section 23 imposes no continuing requirement for those facilities to conduct dog racing or any other pari-mutuel activity in order to operate slot machines. That requirement is imposed by statute.

- 15 -

§ 551.104(4)(c), Fla. Stat. (2018) (requiring "[a]s a condition of licensure" that slot machine operators shall "[c]onduct no fewer than a full schedule of live racing or games as defined in s. 550.002(11)"). Similarly, the link between cardroom operations and dog racing is a creature of statute, not the Florida Constitution. § 849.086(5)(a), Fla. Stat. (2018) (providing that "[a] cardroom license may only be issued to a licensed pari-mutuel permitholder"); *see also* § 550.3551(6)(a), Fla. Stat. (2018) (requiring a pari-mutuel permitholder to conduct a certain number of races as a condition of licensure).

Absent these statutory requirements to conduct dog racing in order to maintain a current license in good standing, pari-mutuel permitholders in Broward County or Miami-Dade County would qualify to operate slot machines pursuant to Article X, section 23 even if they had not conducted a single race or game since 2003. In other words, Article X, section 23 relates only to past dog racing, and Amendment 13 relates only to future dog racing. If approved, Amendment 13 would not authorize the creation of new slot machine operations in Broward and Miami-Dade Counties, or anywhere else: only existing gaming activities would be affected, and only to the extent that certain statutory requirements would be removed. Amendment 13's ballot language cannot be defective for failing to disclose a material effect on Article X, section 23 because Amendment 13 has no such effect in the first place. We therefore conclude the circuit court erred when it

- 16 -

determined the ballot language was defective for failing to inform voters that Amendment 13 would materially affect Article X, section 23.

With regard to Amendment 13's effect on other forms of gaming, we conclude the ballot language's statement that "[o]ther gaming activites are not affected" by Amendment 13 is accurate. To "affect" is defined as "to produce a material influence upon or alteration in" a thing or activity. *Merriam-Webster's Collegiate Dictionary* 19 (10th ed. 1994). A reasonable voter would understand the phrase "are not affected" as used in Amendment 13's ballot summary to mean the activities in question will continue without material change. *See Advisory Op. to the Att'y Gen. re Fla. Marriage Prot. Amend.*, 926 So. 2d 1229, 1237 (Fla. 2006) (analyzing the "plain meaning" of words in the ballot summary "according to dictionary definition"). If approved by the voters, Amendment 13 would forbid licensed Florida pari-mutuel operators from racing any dog in Florida in connection with a wager, and it would also prohibit all persons in Florida from wagering on live dog races which occur in Florida. Furthermore, as discussed above, it would remove existing statutory requirements that cardrooms and slot machine operations which obtained their licenses based on underlying dog-racing permits continue to conduct dog races in order to maintain their cardroom and slot machine licenses. If Amendment 13 is adopted, therefore, the only activities which will change in a material way are dog racing in Florida and wagering thereon,

which will cease.  Horse racing, jai alai, and other permitted gaming activities will continue on January 1, 2021, just as they did on December 31, 2020.  Cardrooms and slot machine operations at horse-racing facilities and jai alai frontons will continue to be linked to the relevant underlying pari-mutuel permits.  In short, Amendment 13 will not directly affect other forms of gaming.  The ballot language accurately informs voters of this, and we therefore hold the circuit court erred when it concluded the ballot language would mislead voters about Amendment 13's effect on other forms of gaming.

### III. "Ends Dog Racing"

"When the summary of a proposed amendment does not accurately describe the scope of the text of an amendment, it fails in its purpose and must be stricken." *Term Limits Pledge*, 718 So. 2d at 804.  A proposed amendment "must stand on its own merits and not be disguised as something else." *Askew*, 421 So. 2d at 156.  Furthermore, as we have stated, "the [ballot] title cannot be read in isolation.  Section 101.161 requires the ballot summary and title to be read together." *Tax Limitation*, 673 So. 2d at 868.

The circuit court concluded Amendment 13's ballot language was defective because it would mislead voters to conclude that Amendment 13 would end all racing of all dogs, when its true scope was much more limited.  The circuit court also concluded the ballot language would mislead voters to believe that all

- 18 -

wagering on dog racing would be prohibited, even though in-state betting on out-of-state racing would be allowed to continue.

We disagree. First, a reasonable voter would not interpret the ballot language as a whole to state that Amendment 13 would prohibit races of dogs in other contexts than in connection with wagering. Although the ballot title "ENDS DOG RACING" would permit that conclusion if taken in isolation, the ballot summary clarifies that Amendment 13 prohibits only "commercial dog racing in connection with wagering." Reading the ballot summary as a single text, it would be unreasonable to conclude Amendment 13 extends to other forms of racing. The ballot language accurately describes the scope of Amendment 13 as being limited to racing of dogs in connection with wagering. Therefore, we conclude the circuit court's determination to the contrary was error.

Furthermore, a reasonable voter would not interpret the ballot language to mean that Amendment 13 will prohibit persons in Florida from wagering on out-of-state dog races. Such an interpretation misreads the ballot language. The ballot summary states Amendment 13 "[p]hases out commercial dog racing in connection with wagering." The direct object of the verb phrase "[p]hases out" is "dog racing" and not "wagering." According to the plain text of the ballot language, therefore, "dog racing" is the primary regulated activity, and reasonable voters would understand this to be so. In effect, the circuit court held voters would read

an additional phrase into the ballot summary, such that it would read: "Phases out commercial dog racing in connection with wagering *and wagering in connection with dog racing* by 2020." The italicized clause is not present in the ballot language. Although we assume, within certain limits, that voters will extrapolate from ballot language with respect to certain reasonably ascertainable effects of a proposed amendment on related provisions of existing law, *see Smith*, 606 So. 2d at 621, nothing in our precedent supports the conclusion that reasonable voters will add terms to the ballot language on their own initiative in such a way as to expand the proposed amendment's scope. To the contrary, we have explained that a ballot summary must not "require[] the voter to infer a meaning which is nowhere evident on the face of the summary itself." *Id.* We therefore conclude the circuit court erred when it determined Amendment 13's ballot language misled voters with regard to Amendment 13's scope.

## Conclusion

As explained above, we hold Amendment 13's fundamental value provision is prefatory, and that the ballot language is not clearly and conclusively defective for failing to inform voters of that provision. We further hold the ballot language accurately states the effect, or lack thereof, Amendment 13 would have on other forms of gaming should it be adopted by the voters. Finally, we hold the ballot language does not mislead voters with respect to Amendment 13's scope.

Accordingly, the decision of the circuit court is hereby reversed, the injunction entered pursuant to that judgment is hereby vacated, and it is hereby ordered that Amendment 13 appear on the ballot for the November 2018 general election. No motion for rehearing will be allowed.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, POLSTON, LABARGA, and LAWSON, JJ., concur.
QUINCE, J., dissents with an opinion.

QUINCE, J., dissenting.

I agree with the circuit court that the language of the ballot title and summary of Amendment 13 is clearly and conclusively defective as it relates to the free-standing casinos without pari-mutuel activities provided for in Article X, section 23, of the Florida Constitution. Accordingly, I dissent.

As stated by the circuit court, contrary to the ballot summary and title's assertion that other forms of gaming would not be affected by Amendment 13, the facilities whose licenses are based on underlying dog-racing permits are currently required to continue to conduct dog races. The majority concludes that because the restriction on the licenses is merely statutory and the constitutional provision was based on past dog races, not future races, Amendment 13 will not affect other forms of gaming. I disagree. There is no reasonable way for a voter to know whether, by voting yes for this amendment, they are also voting to either suspend

- 21 -

or expand all pari-mutuel activities in the State because Amendment 13 would waive an important condition of licensure for operators of cardrooms and slot machines whose licenses arose out of their pari-mutuel dog racing permits.

For these reasons, I dissent.

Certified Judgments of Trial Courts in and for Leon County – Karen A. Gievers, Judge - Case No. 372018CA001114 – An Appeal from the District Court of Appeal, First District, Case No. 1D18-3260

Pamela Jo Bondi, Attorney General, Amit Agarwal, Solicitor General, Edward M. Wenger, Chief Deputy Solicitor General, Jordan E. Pratt, Deputy Solicitor General, Tallahassee, Florida,

 for Appellants

Major B. Harding, Stephen C. Emmanuel, and Kevin A. Forsthoefel of Ausley McMullen, Tallahassee, Florida; Jeff Kottkamp of Jeff Kottkamp, P.A., Tallahassee, Florida; and Paul Hawkes, Tallahassee, Florida,

 for Appellees

Ralph A. DeMeo and Lauren M. Deweil of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Tallahassee, Florida,

 for Amici Curiae The Animal Law Section of the Florida Bar and the
 Animal Legal Defense Fund

M. Stephen Turner and Leonard M. Collins of Nelson Mullins Broad and Cassel, Tallahassee, Florida,

 for Amicus Curiae Committee to Protect Dogs