# Supreme Court of Florida

_____

No. SC19-1267

_____

### ADVISORY OPINION TO THE ATTORNEY GENERAL RE: ALL VOTERS VOTE IN PRIMARY ELECTIONS FOR STATE LEGISLATURE, GOVERNOR, AND CABINET.

March 19, 2020
### CORRECTED OPINION

PER CURIAM.

The Attorney General of Florida has petitioned this Court for an advisory opinion as to the validity of an initiative petition to amend the Florida Constitution titled "All Voters Vote in Primary Elections for State Legislature, Governor, and Cabinet" (the Initiative). We have jurisdiction. *See* art. IV, § 10, art. V, § 3(b)(10), Fla. Const.

For the reasons explained below, we conclude that the Initiative complies with the single-subject requirement of article XI, section 3, of the Florida Constitution and that the ballot title and summary comply with the requirements of section 101.161(1), Florida Statutes (2019). Accordingly, we approve the Initiative for placement on the ballot.

## BACKGROUND

On July 26, 2019, the Attorney General petitioned this Court for an opinion as to the validity of the Initiative, which is sponsored by All Voters Vote, Inc., and was circulated pursuant to article XI, section 3, of the Florida Constitution. The sponsor submitted a brief supporting the validity of the Initiative. The Attorney General submitted a brief in opposition, as did the Florida Democratic Party and the Republican Party of Florida.

The Initiative would add several new subsections to article VI, section 5, of the Florida Constitution, and would read as follows:

(c) All elections for the Florida legislature, governor and cabinet shall be held as follows:

(1) A single primary election shall be held for each office. All electors registered to vote for the office being filled shall be allowed to vote in the primary election for said office regardless of the voter's, or any candidate's, political party affiliation or lack of same.

(2) All candidates qualifying for election to the office shall be placed on the same ballot for the primary election regardless of any candidate's political party affiliation or lack of same.

(3) The two candidates receiving the highest number of votes cast in the primary election shall advance to the general election. For elections in which only two candidates qualify for the same office, no primary will be held and the winner will be determined in the general election.

(4) Nothing in this subsection shall prohibit a political party from nominating a candidate to run for office under this subsection. Nothing in this subsection shall prohibit a party from endorsing or otherwise supporting a candidate as provided by law. A candidate's affiliation with a political party may appear on the ballot as provided by law.

(5) This amendment is self-executing and shall be effective January 1, 2024.

The ballot title for the Initiative is: "All Voters Vote in Primary Elections for State Legislature, Governor, and Cabinet." The ballot summary for the Initiative is:

Allows all registered voters to vote in primaries for state legislature, governor, and cabinet regardless of political party affiliation. All candidates for an office, including party nominated candidates, appear on the same primary ballot. Two highest vote getters advance to general election. If only two candidates qualify, no primary is held and winner is determined in general election. Candidate's party affiliation may appear on ballot as provided by law. Effective January 1, 2024.

**STANDARD OF REVIEW**

When this Court renders an advisory opinion concerning a proposed constitutional amendment arising through the citizen initiative process, "[the Court's] review of the proposed amendment is confined to two issues: (1) whether the proposed amendment itself satisfies the single-subject requirement of article XI, section 3, of the Florida Constitution; and (2) whether the ballot title and summary satisfy the requirements of section 101.161(1), Florida Statutes (201[9])." *Advisory Op. to Att'y Gen. re Voter Control of Gambling*, 215 So. 3d

- 3 -

1209, 1212 (Fla. 2017). In addressing these two issues, the Court must not address the merits or wisdom of the Initiative. *Advisory Op. to Att'y Gen. re Treating People Differently Based on Race in Pub. Educ.*, 778 So. 2d 888, 891 (Fla. 2000). Further, the Court has a "duty . . . to uphold the proposal unless it can be shown to be 'clearly and conclusively defective.' " *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 795 (Fla. 2014) (*Medical Marijuana I*) (quoting *Advisory Op. to Att'y Gen. re Fla.'s Amend. to Reduce Class Size*, 816 So. 2d 580, 582 (Fla. 2002)). "This Court has traditionally applied a deferential standard of review to the validity of a citizen initiative petition and 'has been reluctant to interfere' with 'the right of self-determination for *all* Florida's citizens' to formulate 'their own organic law.' " *Id.* at 794 (quoting *Advisory Op. to Att'y Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses*, 818 So. 2d 491, 494 (Fla. 2002)).

## ANALYSIS

*Single-Subject Requirement*

The Florida Constitution limits constitutional amendments proposed by citizen initiative to "but one subject and matter directly connected therewith." Art. XI, § 3, Fla. Const. The Court "require[s] strict compliance with the single-subject rule in the initiative process for constitutional change." *Fine v. Firestone*, 448 So. 2d 984, 989 (Fla. 1984). "In evaluating whether a proposed amendment

- 4 -

violates the single-subject requirement, the Court must determine whether it has a 'logical and natural oneness of purpose.' " *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Debilitating Conditions*, 181 So. 3d 471, 477 (Fla. 2015) (*Medical Marijuana II*) (quoting *Treating People Differently Based on Race*, 778 So. 2d at 891-92). The single-subject requirement prevents an initiative from (1) engaging in logrolling; or (2) substantially altering or performing the functions of multiple branches of government. *Id.*; *Advisory Op. to Att'y Gen. re Water & Land Conservation—Dedicates Funds to Acquire & Restore Fla. Conservation & Recreation Lands*, 123 So. 3d 47, 50 (Fla. 2013). An initiative satisfies the oneness of purpose standard—and therefore does not engage in logrolling—"when it 'may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme.' " *Water & Land Conservation*, 123 So. 3d at 51 (quoting *Advisory Op. to Att'y Gen. re Fairness Initiative Requiring Legislative Determination*, 880 So. 2d 630, 634 (Fla. 2004)).

In the present case, the Initiative has "a logical and natural oneness of purpose," namely to allow all registered voters to vote in primary elections for state legislature, governor, and cabinet. To achieve this, the Initiative provides that all qualified registered voters can vote in such primaries regardless of party affiliation, that candidates qualifying for the specified offices appear on the same ballot, and that the two candidates receiving the highest number of votes advance

to the general election. Because each of the Initiative's components are part of a single dominant plan or scheme, the Initiative does not engage in impermissible logrolling.

Although the interested parties do not dispute whether the Initiative substantially alters or performs the functions of multiple branches of government, we conclude that the Initiative does not do so. Accordingly, we conclude that the Initiative complies with the single-subject requirement of article XI, section 3, of the Florida Constitution.

*Ballot Title and Summary*

Next, we address whether the Initiative will be "accurately represented on the ballot." *Medical Marijuana I*, 132 So. 3d 786, 797 (Fla. 2014) (quoting *Armstrong v. Harris*, 773 So. 2d 7, 12 (Fla. 2000)). Section 101.161(1), Florida Statutes (2019), which sets forth the requirements for the ballot title and summary of an initiative petition, provides as follows:

> [A] ballot summary of such amendment or other public measure shall be printed in clear and unambiguous language on the ballot . . . . The ballot summary of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. . . . The ballot title shall consist of a caption, not exceeding 15 words in length, by which the measure is commonly referred to or spoken of.

These statutory requirements serve to ensure that the ballot summary and title "provide fair notice of the content of the proposed amendment" to voters so

- 6 -

that they "will not be misled as to [the proposed amendment's] purpose, and can cast an intelligent and informed ballot." *Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers*, 705 So. 2d 563, 566 (Fla. 1998) (quoting *Advisory Op. to Att'y Gen.—Fee on Everglades Sugar*, 681 So. 2d 1124, 1127 (Fla. 1996)). This Court has explained that "the ballot title and summary may not be read in isolation, but must be read together in determining whether the ballot information properly informs the voters." *Advisory Op. to Att'y Gen. re Voluntary Univ. Pre-Kindergarten Educ.*, 824 So. 2d 161, 166 (Fla. 2002).

In the present case, the ballot title is composed of twelve words, and the ballot summary is composed of seventy-three words. These respectively fall within the fifteen and seventy-five-word statutory limits. *See* § 101.161(1), Fla. Stat. (2019).

Moreover, the ballot title and summary comply with the clarity requirements of section 101.161(1). The ballot title clearly identifies the subject of the Initiative. The ballot summary clearly and unambiguously explains the chief purpose of the Initiative, which is to allow all registered voters to vote in primary elections in Florida for state legislature, governor, and cabinet. Further, the ballot summary explains the details of this change in the primary election process by outlining that if the Initiative passes, all candidates for an office will appear on the same primary ballot, and the two highest vote getters will advance to the general election.

Regarding the opponents' complaint that the summary and title do not explain possible ramifications of altering the current primary election process, or explicitly detail how party nominations will occur if the amendment passes, this Court has explained that "an exhaustive explanation of the interpretation and future possible effects of [an] amendment [is] not required" in the ballot title and summary. *Advisory Op. to Att'y Gen. re Treating People Differently Based on Race in Pub. Educ.*, 778 So. 2d 888, 899 (Fla. 2000); *see also Advisory Op. to Att'y Gen. re Standards for Establishing Legislative Dist. Boundaries*, 2 So. 3d 175, 186 (Fla. 2009) ("[A] ballot summary need not (and because of the statutory word limit, often cannot) explain 'at great and undue length' the complete details of a proposed amendment, and some onus falls upon voters to educate themselves about the substance of the proposed amendment." (quoting *Advisory Op. to Att'y Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses*, 818 So. 2d 491, 498 (Fla. 2002)); *see also Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Political Candidates' Campaigns,* 693 So. 2d 972, 975-76 (Fla. 1997) ("[T]he [ballot] title and summary need not explain every detail or ramification of the proposed amendment.").

## CONCLUSION

For these reasons, we hold that the Initiative meets the legal requirements of article XI, section 3, of the Florida Constitution, and that the ballot title and

summary comply with section 101.161(1).  Accordingly, we approve the Initiative

for placement on the ballot.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, and LAWSON, JJ., concur.
LAWSON, J., concurs specially with an opinion, in which CANADY, C.J.,
concurs.
MUÑIZ, J., dissents with an opinion.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED
BY 9:00 A.M. ON FRIDAY, MARCH 27, 2020.  A RESPONSE TO THE
MOTION FOR REHEARING/CLARIFICATION MAY BE FILED BY 9:00 A.M.
ON SATURDAY, MARCH 28, 2020.  NOT FINAL UNTIL THIS TIME PERIOD
EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF
FILED, DETERMINED.

LAWSON, J., concurring and concurring specially.

I fully concur in the majority opinion and write separately to explain why I

disagree with the dissent's view that three defects in the ballot title and summary

preclude us from approving the initiative for placement on the ballot.  The dissent

argues that in addition to changing the constitutional status quo by creating an

"all-candidate, all-voter top-two primary election for the legislature, governor, and

cabinet" as disclosed in the ballot summary, the proposed amendment would also

upend the constitutional status quo in a second, undisclosed manner that is not

argued by a single opponent of the proposed amendment—namely, by taking away

the Legislature's discretion to provide for state-run elections to choose political

party nominees for those offices.  Dissenting op. at 20, *see also id.* at 25-28.

- 9 -

Drawing from this conclusion, the dissent further argues that the ballot summary misleads in two additional ways. First, the dissent contends that the ballot summary "leads voters to believe that party-nominated candidates would necessarily be a feature of the primary election scheme" even though "the proposed amendment itself neither requires nor assumes the existence of such candidates." *Id.* at 20; *see also id.* at 28-29. Finally, the dissent argues that the "all voters vote" language in the ballot title and summary misleads by falsely signaling that the proposed amendment "would *expand* access to voting" even though it would also "*contract* access to voting" by preventing voters from selecting political party nominees for the offices at issue via state-run elections. *Id.* at 29-30. I respectfully disagree.

**The proposed amendment does not preclude a state-sponsored partisan nomination process.**

In analyzing the requirement of section 101.161(1) for the ballot summary to be "an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure," the dissent correctly begins its thoughtful analysis with the text of the statute. Ultimately, however, the dissent concludes that "the chief purpose" means all "material legal effects," with "material" meaning all changes to the constitution "that would be material to an objectively reasonable voter." Dissenting op. at 24-25. I am unconvinced that the dissent's ultimate conclusion as to the meaning of the statute is faithful to the plain language of the text. *See*

- 10 -

*Dianderas v. Fla. Birth Related Neurological*, 973 So. 2d 523, 527 (Fla. 5th DCA 2007) ("When a term is undefined by statute, '[o]ne of the most fundamental tenets of statutory construction' requires that we give a statutory term 'its plain and ordinary meaning.' " (quoting *Green v. State*, 604 So. 2d 471, 473 (Fla. 1992))).

Regarding "the chief purpose" requirement of section 101.161(1), because, in the context of the statute, the plain and ordinary meaning of the word "chief" is "[t]he principal or most important part," *Black's Law Dictionary* (11th ed. 2019), and because the plain and ordinary meaning of the word "purpose" is "[a]n objective, goal, or end," *id.*, I am inclined to read "the chief purpose" as meaning the principal or most important objective, goal, or end.[1]

As the majority explains, the ballot summary satisfies the statutory requirement to clearly and unambiguously explain the chief purpose—i.e., the principal or most important objective, goal, or end—of the proposed amendment, "which is to allow all registered voters to vote in primary elections in Florida for state legislature, governor, and cabinet." Majority op. at 7. The ballot summary plainly tells voters that the amendment would create a voting process in which

_____

1. The dissent uses a more specialized definition of "purpose" in its analysis, which appears to be consistent with our case law and does not appear to be clearly erroneous. In this case, the legal analysis is not materially altered by using the more specialized definition of purpose (as meaning "legal effect") instead of the more common definition ("objective, goal, or end"). Given the limited objective of this concurring opinion, I find it unnecessary to further analyze the word "purpose" in the context of section 101.161(1) and will limit my analysis to the dissent's questionable reading of the word "chief" in this context.

"[a]ll candidates for an office, including party nominated candidates, appear on the same primary ballot" and that a "[c]andidate's party affiliation may appear on [that] ballot as provided by law."  It also discloses that the "[t]wo highest vote getters" from this primary will "advance to [the] general election."  The differences between the proposed system and our long-standing statutorily created partisan primary system are self-evident and would be obvious to any reasonable voter.

Although the dissent acknowledges that in plain language the statute requires disclosure of " 'the chief purpose,' singular," of the measure, dissenting op. at 24, and that "chief" in this context "has to mean 'marked by *greatest* importance, significance, influence," *id.* at 23 (quoting *Webster's Third New International Dictionary* 387 (1993)) (emphasis added), the dissent explains that the statute should not be read to mean "only the most important" purpose because "article XI, section 3 allows a proposed amendment to contain multiple components, so long as those components are 'parts or aspects of a single dominant plan or scheme.' "  *Id.* at 24 (quoting *Advisory Op. to the Att'y Gen. re Rights of Elec. Consumers Regarding Solar Energy Choice*, 188 So. 3d 822, 828 (Fla. 2016)).  The dissent further explains, "If the constitution permits multi-component (but single subject) proposals, it makes most sense to read section 101.161(1) as requiring the ballot summary to identify all material components of the overall plan."  *Id.*  This strikes me as a justification for discarding the plain

- 12 -

language of the statute in favor of a discordant reading that the dissent views as reflecting better policy than the words chosen by the Legislature. Even if I viewed this as an appropriate approach to statutory construction, I am not convinced that requiring disclosure of "all material components of the overall plan" makes more sense than requiring disclosure of "only the most important," i.e. "the chief," purpose of a ballot initiative. We put a candidate's name on the ballot and expect voters to educate themselves outside of the ballot box as to the pros and cons of voting for one candidate over another. Requiring a plain statement of "the chief purpose" of a proposal would leave it to voters to educate themselves about the pros and cons of the proposal, which is how our political process normally works. In addition, it seems highly unlikely that citizens will wait until they are voting to study the ballot summary in an attempt to figure out their position on a ballot measure. These measures are routinely debated with rigor by proponents and opponents before an election—and I fail to see how requiring long summaries that clutter a ballot in an attempt to explain all effects that amendment sponsors predict this Court will view as significant enough to require explanation would add significant value to the process.

However, even if I could agree to read the statute's "the chief purpose" requirement as tantamount to a requirement for the ballot summary to explain both "the chief purpose" *and* all secondary, tertiary, or other "material legal effects" of a

- 13 -

proposed amendment, I would still disagree with the dissent's conclusion that the ballot summary is fatally flawed. The proposed amendment simply does not have the undisclosed secondary purpose of precluding a state-sponsored partisan nomination process. Notwithstanding the lack of express language to this effect in the proposed amendment, the dissent infers from the provision "[a] single primary election shall be held for each office" that the proposed amendment would strip away the Legislature's power to provide for state-sponsored partisan nomination elections before the all-voter primary election. It would not.

To the contrary, proposed subsection (c)(4) expressly states that the amendment does not prohibit a party nomination process that would necessarily take place prior to the new all-voters primary: "Nothing in this subsection shall prohibit a political party from nominating a candidate to run for office under this subsection." Additionally, the same subsection contemplates that the Legislature will have a role in defining how party affiliation is handled on the ballot: "Nothing in this subsection shall prohibit a party from endorsing or otherwise supporting a candidate as provided by law. A candidate's affiliation with a political party may appear on the ballot as provided by law."

In the absence of express language limiting the Legislature's power to create a state-sponsored partisan nomination process, the proposed amendment, if approved by the voters, cannot be construed as having this effect—not only

- 14 -

because we cannot add words to the constitution, *Pleus v. Crist*, 14 So. 3d 941, 945 (Fla. 2009) ("We remain mindful that in construing a constitutional provision, we are not at liberty to add words that were not placed there originally . . . ."), but also because the amendment would have to be construed in harmony with the portion of the constitution giving the Legislature broad authority to exercise "[t]he legislative power of the state," art. III, § 1, Fla. Const. If an amendment does not expressly or by necessary implication repeal or modify an existing provision, the amendment co-exists with all other provisions of the constitution that have not been repealed by another amendment. *Jackson v. Consol. Gov't of Jacksonville*, 225 So. 2d 497, 500-01 (Fla. 1969) ("Unless the later amendment expressly repeals or purports to modify an existing provision, the old and new should stand and operate together unless the clear intent of the later provision is thereby defeated." (citing *Bd. of Pub. Instruction of Polk Cty. v. Bd. of Comm'rs of Polk Cty.*, 50 So. 574 (Fla. 1909))); *see also State v. Div. of Bond Fin.*, 278 So. 2d 614, 617-18 (Fla. 1973) ("It is a fundamental rule of construction that, if possible, amendments to the Constitution should be construed so as to harmonize with other constitutional provisions . . . .").

Under the broad power granted to the Legislature by article III, section 1 of the Florida Constitution, "the Legislature may exercise any lawmaking power that is not forbidden by the organic law of the land." *Stone v. State*, 71 So. 634, 635 (Fla. 1916) (interpreting a similar provision in a prior version of the constitution).

This power includes, of course, the power to provide for the organization and regulation of state-sponsored elections to select nominees of political parties. Indeed, the dissent acknowledges that such elections are "universally held to be proper subjects for legislative action." Dissenting op. at 26 (quoting *State ex rel. Andrews v. Gray*, 169 So. 501, 505 (Fla. 1936)).

Contrary to what the dissent asserts, therefore, the proposed amendment does not strip the Legislature of its power to provide for state-sponsored elections to establish party nominees before the all-voter primary. The dissent erroneously reads that limitation into the proposed amendment, contrary to its plain language and the remainder of the constitution.

**The ballot summary's reference to "party nominated candidates" is not misleading.**

The dissent next argues that because the ballot summary references "party nominated candidates," it misleads voters "to believe that party-nominated candidates would necessarily be a feature of the primary election scheme" even though "the proposed amendment itself neither requires nor assumes the existence of such candidates." Dissenting op. at 20; *see also id.* at 28-29. As the dissent acknowledges, this conclusion is "closely related" to the dissent's first perceived defect. *Id.* at 28.

However, even setting aside the dissent's faulty premise that the proposed amendment would preclude a state-sponsored partisan nomination process, the

- 16 -

ballot summary's reference to "party nominated candidates" is not misleading. Subsection (c)(4) of the proposed amendment provides that "[n]othing in [the proposed amendment] shall prohibit a political party from nominating a candidate to run for office under this subsection" or "prohibit a party from endorsing or otherwise supporting a candidate as provided by law," and further provides that "[a] candidate's affiliation with a political party may appear on the ballot as provided by law." Nothing in the text of the ballot summary misleads voters to believe that party-nominated candidates are *required* to be a feature of the proposed "all voters vote" primary election scheme. Rather, the ballot summary explains that "[a]ll candidates for an office, including party nominated candidates, appear on the same primary ballot" and further states that "party affiliation *may appear* on ballot *as provided by law*." (Emphasis added.) This language fairly informs the voter—and any reasonable voter would understand it to mean—that in the proposed "all voters vote" primary, any party-nominated candidate would be included on the same ballot as all of the candidates who qualify for the office and that how or whether party affiliation appears on the ballot will be determined by general law.

Moreover, any doubt that the ballot summary misleads voters to believe that party-nominated candidates are "a necessary feature of the election scheme under the proposed amendment," dissenting op. at 29, is dispelled by the ballot summary

- 17 -

provision that reads "[i]f only two candidates qualify, no primary is held and the winner is determined at the general election." This provision does not qualify the word "candidates" or otherwise suggest that at least one candidate must be a party-nominated candidate.

Accordingly, the ballot summary does not mislead voters to believe that party-nominated candidates are a necessary feature of the proposed "all voters vote" primary election scheme.

**The "all voters vote" language of the ballot title and summary does not mislead voters to believe that voting access is expanded rather than contracted.**

The final flaw argued by the dissent is that the "all voters vote" language of the ballot title and summary misleads voters to believe that voting access is expanded rather than contracted. *See* dissenting op. at 29-30. Like the dissent's second perceived flaw, this conclusion flows from the erroneous premise that the proposed amendment, if adopted, would preclude a state-sponsored nomination process and, in that way, "contract" access to voting. However, as explained above, the plain language of the proposed amendment does not do this, and if the proposed amendment is adopted, we could not interpret it to preclude a state-sponsored partisan nomination process prior to the "all voters vote" primary. Accordingly, the "all voters vote" language is not misleading.

**Conclusion**

As explained in the majority opinion, this Court has a "duty . . . to uphold the proposal unless it can be shown to be 'clearly and conclusively defective.' " *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 795 (Fla. 2014) (*Medical Marijuana I*) (quoting *Advisory Op. to Att'y Gen. re Fla.'s Amend. to Reduce Class Size*, 816 So. 2d 580, 582 (Fla. 2002)). This "deferential standard of review [applied] to the validity of a citizen initiative petition" is appropriately grounded in our " 'reluctan[ce] to interfere' with 'the right of self-determination for *all* Florida's citizens' to formulate 'their own organic law.' " *Id.* at 794 (quoting *Advisory Op. to Att'y Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses*, 818 So. 2d 491, 494 (Fla. 2002)).

Read together, the ballot title and summary accurately explain the proposed amendment, which does not, as the dissent argues, have an undisclosed secondary purpose of precluding a state-sponsored partisan nomination process prior to the "all voters vote" primary. Nor are the title and ballot summary misleading for the related reasons argued by the dissent regarding the necessity of party-nominated candidates or contraction of voting access. Because the ballot title and summary are not clearly and conclusively defective, I fully join the majority in approving the initiative for placement on the ballot.

CANADY, C.J., concurs.

MUÑIZ, J., dissenting.

The proposed amendment would change the constitutional status quo in at least two significant ways.  First, it would mandate an all-candidate, all-voter top-two primary election for the legislature, governor, and cabinet.  Second, by mandating "a single primary election" for each office, it would take away the Legislature's discretion to provide for state-run elections to choose political party nominees for those offices.  The ballot summary here discloses the first change, but not the second.  In fact, the ballot summary does not even hint at the second change, which would upend voter expectations by prohibiting an election practice that has prevailed in our state for over a century.  In a related way, the ballot summary is affirmatively misleading.  It leads voters to believe that party-nominated candidates would necessarily be a feature of the primary election scheme under the proposed amendment.  But the proposed amendment itself neither requires nor assumes the existence of such candidates.  These defects in the ballot summary are fatal under section 101.161(1), Florida Statutes (2019), and I therefore respectfully dissent from the majority's decision to approve the proposed amendment for placement on the ballot.

### Section 101.161(1) requires the ballot summary to disclose the proposed amendment's material legal effects.

The relevant part of section 101.161(1) says that the ballot summary must be "an explanatory statement, not exceeding 75 words in length, of the chief purpose

- 20 -

of the measure."  The statute does not define any of the key terms: explanatory, chief, and purpose.  Therefore, we must give those terms their ordinary meaning, informed by the context in which they appear.

Although it is central to the requirements of section 101.161(1), the word "purpose" as used in this context does not have an obvious meaning.  After all, "[a]ny provision of law or of private ordering can be said to have a number of purposes, which can be placed on a ladder of abstraction."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 18 (2012).  And "nearly every end is a means to another end."  Max Radin, *Statutory Interpretation*, 43 Harv. L. Rev. 863, 876 (1930).

Recognizing this difficulty, courts have distinguished between a law's "ultimate purpose" and its "immediate purpose."  *See, e.g.*, *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019).  A law's ultimate purpose is remote, relatively abstract, and often contestable.  By contrast, a law's immediate purpose can be derived from the words of the statute itself.  *See id.*  Put differently, a statute's immediate purpose consists of the specific means by which the statute pursues its more remote objectives or goals.  *See* Radin, *supra* at 877.  The closest dictionary definition for immediate purpose is the one that defines "purpose" as "effect or result . . . attained."  *Webster's Third New International Dictionary 1847* (1993).  There are

several reasons why section 101.161(1) is best understood as using the word purpose in the sense of immediate purpose.

Only a measure's immediate purpose—the specific changes it would make to the constitutional text—can be determined objectively. The more remote the statement of a measure's purpose, the more subjective (and debatable) that purpose becomes. Textually, section 101.161(1) requires a statement of the purpose "of the measure." But as one moves up the ladder of abstraction, the focus inevitably shifts to the subjective purpose *of the sponsor* in proposing the measure.

The very nature of a ballot demands objectivity in the presentation of a measure's purpose. A ballot puts before the voter a choice. To make an informed decision, the voter must know *how* a measure would amend the constitution; the *why* behind a measure is far less relevant, if relevant at all. Stating a measure's more abstract purpose—as opposed to its immediate purpose—can get too close to advocacy, which has no place on a ballot. "Ballots serve primarily to elect candidates"—or, in this context, to approve or disapprove proposed constitutional amendments—"not as forums for political expression." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997).

Finally, by consistently equating purpose in the context of section 101.161(1) with legal effect, this Court's case law reflects an implicit understanding that the statute refers to immediate purpose. The Legislature

adopted section 101.161(1)'s "chief purpose" requirement for ballot summaries in 1980. Ch. 80-304, 2, Laws of Fla. Soon thereafter, in *Askew v. Firestone*, 421 So. 2d 151 (1982), we analyzed a ballot summary in terms of whether it accurately presented "the amendment's chief effect." *Id*. at 155. Two years later, we said that "[t]he ballot summary should tell the voter the legal effect of the amendment, and no more." *Evans v. Firestone*, 457 So. 2d 1351, 1355 (Fla. 1984). Jumping ahead several decades, we said in one of our most recent ballot initiative cases that we determine a proposed amendment's purpose by looking at "objective criteria inherent in the amendment itself, such as the amendment's main effect." *Advisory Op. to Att'y Gen. re Citizenship Requirement to Vote in Fla. Elections*, 45 Fla. L. Weekly S7, S8 (Fla. Jan. 16, 2020) (citation omitted).

Having established that the word "purpose" in section 101.161(1) means immediate purpose or legal effect, it remains necessary to determine what the statute means by "*chief* purpose." (Emphasis added.) In this context, "chief" has to mean "marked by greatest importance, significance, influence." *Webster's Third New International Dictionary* 387 (1993). This introduces a concept of materiality. As our cases have repeatedly observed, a ballot summary "need not discuss every detail or consequence of the amendment." *Advisory Op. to Att'y Gen. re Raising Florida's Minimum Wage*, 285 So. 3d 1273, 1277 (Fla. 2019) (citation omitted). Instead, the legislature's use of the phrase "chief purpose"

means that the ballot summary must set forth the legal effects that would be material to an objectively reasonable voter. *See Dep't of State v. Fla. Greyhound Ass'n*, 253 So. 3d 513, 520 (Fla. 2018) (a ballot summary that fails to inform the voter of an amendment's "material effects" is defective).

Section 101.161(1) refers to "the chief purpose," singular, of the measure. Does this mean that the author of a ballot summary must determine a proposed amendment's discrete legal effects and then set forth only the most important one in the ballot summary? That would be an unreasonable interpretation of the statute. We have consistently held that article XI, section 3 allows a proposed amendment to contain multiple components, so long as those components are "parts or aspects of a single dominant plan or scheme." *Advisory Op. to the Att'y Gen. re Rights of Electricity Consumers Regarding Solar Energy Choice*, 188 So. 3d 822, 828 (Fla. 2016). If the constitution permits multi-component (but single subject) proposals, it makes the most sense to read section 101.161(1) as requiring the ballot summary to identify all material components of the overall plan. This reading is consistent with the statutory text. The immediate purpose of a proposed amendment is to enact a bundle of related legal effects. Therefore, the "chief purpose" of the amendment can be understood in terms of the subset of those legal effects that would be material to a reasonable voter.

Finally, section 101.161(1) says that the ballot summary must be an "explanatory" statement, and that the summary must be printed on the ballot "in clear and unambiguous language." To explain means "to make manifest; present in detail," or "to make plain or understandable." *Webster's Third New International Dictionary* 801 (1993). A ballot summary cannot be explanatory, and its language cannot be clear and unambiguous, unless it makes understandable to the voter the material legal effects of the proposed amendment.[2]

**The ballot summary fails to disclose that, by mandating a "single primary election," the proposed amendment would prohibit state-run elections to select political party nominees for the affected offices.**

The ballot summary in this case violates section 101.161(1) because it completely fails to identify—much less explain—a material legal effect of the proposed amendment. Since 1913, the Legislature has exercised its discretion to require that political party nominees for the legislature, governor, and cabinet be elected in state-run primary elections. Long ago we explained: "[B]ecause of the public importance of securing proper party nominations, the regulation of party primary elections, and the institution of official state-controlled primaries to be

2. In his thoughtful concurrence, Justice Lawson argues that "chief purpose" as used in section 101.161 means "the principal or most important objective, goal, or end." Using this definition would still lead to a requirement that a ballot summary disclose the proposed amendment's material legal effects. As I have explained, section 101.161 requires disclosure of the chief purpose "of the measure," not of the sponsor. Assuming one can impute to a legal text an "objective, goal, or end," that text's most important objective, goal, or end is necessarily to bring about its material legal effects.

conducted and held at public expense, and under the eye of public officials, are universally held to be proper subjects for legislative action." *State ex rel. Andrews v. Gray*, 169 So. 501, 505 (Fla. 1936). For Florida voters who are members of political parties—which is to say, a strong majority of voters—the century-old tradition of electing party nominees in state-run primary elections is an essential aspect of participation in the electoral process. It is not an exaggeration to say that Floridians likely consider voting in such elections to be their right.

The proposed amendment would take away the Legislature's discretion to provide for these state-run party nominating elections for the affected offices. This legal effect is evident from the plain meaning of the proposed amendment's text. That text opens with the statement: "*All* elections for the Florida legislature, governor and cabinet shall be held as follows." (Emphasis added.) And the text goes on to say: "*A single primary election* shall be held for each office." (Emphasis added.) "Single" means one. And it is self-evident that the proposed amendment does not use the phrase "primary election" to mean an election to select a political party's nominee for the general election. Rather, the proposed amendment uses "primary election" the way the dictionary generically defines the phrase: "an election in which qualified voters nominate or express a preference for a particular candidate or group of candidates for political office." *Webster's Third New International Dictionary* 1800 (1993). "Primary" being a relative term, under

the proposed amendment a "primary election" is simply an election before the general election. *Cf. Advisory Op. to the Governor re Implementation of Amendment 4, the Voting Restoration Amendment*, 45 Fla. L. Weekly S10, S14 (Fla. Jan. 16, 2020) (absent contextual indication of technical meaning, words in the constitution should be interpreted in their "plain, common sense").

Taken as a whole, the clause "[a] single primary election shall be held for each office" must mean that the state may hold only one election before the general election at which the listed offices will be voted on. That "single primary election" is necessarily the all-voter, all-candidate primary election that the proposed amendment seeks to bring to life. Any other state-run election before the general election would be an additional, constitutionally prohibited primary election.[3]

The ballot summary does not come close to disclosing this legal effect, even though it would change the constitution in a way that meets any reasonable definition of materiality. The ballot summary does not tell the voters that the proposed amendment mandates "a single primary election" for the affected offices.

---

3. At oral argument, the amendment sponsor maintained that the proposed amendment would permit a hypothetical state-run pre-primary election to select political party nominees (who presumably could then run as party-nominated candidates in the all-voter, all-candidate top-two primary). This is of no consequence, however, because a sponsor's stated interpretation of a proposed amendment cannot trump the plain meaning of the amendment's text. If the amendment were to become part of the constitution, it is the text that would govern, not the sponsor's subjective intentions. *Advisory Op. to the Governor re Implementation of Amendment 4*, 45 Fla. L. Weekly at S12.

A reader of the ballot summary would have no way of knowing that the all-voter, all-candidate primary described in the summary would be the state's *constitutionally exclusive* primary election for those offices.

This proposed change to the constitutional status quo—a status quo that has allowed the Legislature for over 100 years to mandate state-run elections to select political party nominees—is not a mere detail. The proposed amendment would make the selection of political party nominees for the affected offices a private affair, subject to each party's discretion. Given the expense and the logistical complexity of conducting a statewide election in our large and diverse state, no substitute, party-run nomination process is likely to resemble our existing state-run elections. And any objectively reasonable voter would consider this change a material legal effect of the proposed amendment.

### The ballot summary is affirmatively misleading.

This brings us to a closely related way in which the ballot summary is actually affirmatively misleading. The first sentence of section 4 in the proposed amendment reads: "Nothing in this subsection shall prohibit a political party from nominating a candidate to run for office under this subsection." Read together with the remainder of the proposed amendment, this sentence confirms that, going forward, political parties' nomination of candidates for the affected offices would be a private affair, neither required nor prohibited by the proposed amendment. It

is impossible to know whether, if the proposed amendment were to become law, any political party would continue to nominate candidates for the legislature, governor, and cabinet. (For that matter, given the mandatory all-voter, all-candidate primary, it is equally impossible to know what such a "nomination" would mean in practice and effect.)

Contradicting the text of the proposed amendment, the ballot summary expressly assumes that there will continue to be party-nominated candidates for these offices. Specifically, the summary says: "All candidates for an office, *including party nominated candidates*, appear on the same primary ballot." (Emphasis added.) In fact, as explained, party-nominated candidates are not a necessary feature of the election scheme under the proposed amendment. Absent qualifying language, the ballot summary's reference to "party nominated candidates" is affirmatively misleading.

Finally, the ballot title and summary mislead in yet another way. The ballot title announces: "All Voters Vote in Primary Elections for State Legislature, Governor, and Cabinet." The opening line of the ballot summary says: "Allows all registered voters to vote in primaries . . . regardless of political party affiliation." This repeated "all voters vote" theme signals to voters that the proposed amendment would *expand* access to voting, and that is partly true. But

the "all voters vote" language makes it less likely that voters will perceive that the proposed amendment would *contract* access to voting in a separate, critical respect.

**Conclusion**

The ballot summary here is clearly defective under section 101.161(1). The summary's flaw is not that it fails to speculate about what candidate nominating processes, if any, the political parties might adopt to replace state-run primary elections—section 101.161(1) prohibits such speculation. The summary's flaw is not that it fails to identify the proposed amendment's every detail and ramification—section 101.161(1) does not require that either. The summary's flaw is not in the merits of the underlying amendment—our state's existing election practices, however longstanding, are not entitled to any special protection from this Court. The ballot summary here is fatally flawed because it does not explain a known, material legal effect of the proposed amendment: the enactment of a constitutional prohibition on state-run primary elections to select political party nominees for legislature, governor, and cabinet. And the ballot summary is defective for the additional reason that it affirmatively misleads voters by representing that political party nominees are a necessary feature of the proposed amendment's election scheme, when that is not the case. I respectfully dissent.

Original Proceeding – Advisory Opinion – Attorney General

Ashley Moody, Attorney General, Amit Agarwal, Solicitor General, and Jeffrey Paul DeSousa, Deputy Solicitor General, Tallahassee, Florida,

for Petitioner

Mark Herron and Robert A. McNeely of Messer Caparello, P.A., Tallahassee, Florida,

for Interested Party, Florida Democratic Party

Benjamin Gibson, Jason Gonzalez, Daniel Nordby, Amber Stoner Nunnally, and Rachel Procaccini of Shutts & Bowen LLP, Tallahassee, Florida,

for Interested Party, Republican Party of Florida

Glenn Burhans, Jr., Tallahassee, Florida, and Eugene E. Stearns of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Florida,

for Interested Party, All Voters Vote, Inc.