# Supreme Court of Florida

_____

No. SC15-1929
_____

**GRETNA RACING, LLC,**
Petitioner,

vs.

**FLORIDA DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, etc.,**
Respondent.

[May 18, 2017]

CANADY, J.

"Shall slot machines be approved for use at the pari-mutuel [horse track] facility in Gretna, F[lorida]?" This is the question presented by the Gadsden County Commission to the county's voters in a ballot question. And it is the question we now must decide. A majority of the voters answered the question in the affirmative, but the Division of Pari-Mutuel Wagering subsequently denied a slot machine permit to Gretna Racing, LLC. In Gretna Racing, LLC v. Department of Business & Professional Regulation, Division of Pari-Mutuel Wagering, 178 So. 3d 15 (Fla. 1st DCA 2015), the First District upheld the Division's denial of the permit and certified a question of great public importance, which establishes our

jurisdiction. <u>See</u> art. V, § 3(b)(4), Fla. Const. Gretna Racing contends that the Division was required to issue the permit once the voters had answered the ballot question in the affirmative. Based on the provisions of chapter 551, Florida Statutes (2013), governing slot machines and the law establishing the powers of non-charter counties, we conclude that the Division's denial of the slot machine permit sought by Gretna Racing was correct because submission of the ballot question to the voters was not legally authorized.

**I.**

In 2004, Florida's voters adopted a constitutional provision authorizing countywide referenda in Miami-Dade and Broward Counties to approve slot machines at certain existing pari-mutuel facilities. <u>See</u> art. X, § 23, Fla. Const. (2004). Under this provision,

> the governing bodies of Miami-Dade and Broward Counties each may hold a county-wide referendum in their respective counties on whether to authorize slot machines within existing, licensed parimutuel facilities (thoroughbred and harness racing, greyhound racing, and jai-alai) that have conducted live racing or games in that county during each of the last two calendar years before the effective date of this amendment.

<u>Id.</u> § 23(a). The provision specified that slot machines will be authorized for qualifying facilities upon approval by the voters, <u>id.</u>, and directed the Legislature to adopt implementing legislation, <u>id.</u> § 23(b).

Section 551.104(1), Florida Statutes (2013), provides for the issuance by the Division of licenses "to conduct slot machine gaming." Under section 551.104(1), the Division is authorized to issue such licenses to an "eligible facility"—a term that is defined in section 551.102(4). But section 551.104(2) goes on to establish an additional condition for the issuance of licenses: "An application may be approved by the division only after the voters of the county where the applicant's facility is located have authorized by referendum slot machines within pari-mutuel facilities in that county as specified in s. 23, Art. X of the State Constitution." So by its plain terms, section 551.104(2) limits licenses to facilities in counties where the voters have approved slot machines as provided by article X, section 23—which does not extend beyond Miami-Dade and Broward Counties.

Yet the definition of "eligible facility" in section 551.102(4), Florida Statutes (2013), contemplates the issuance of licenses in additional circumstances:

> "Eligible facility" means **[1]** any licensed pari-mutuel facility located in Miami-Dade County or Broward County existing at the time of adoption of s. 23, Art. X of the State Constitution that has conducted live racing or games during calendar years 2002 and 2003 and has been approved by a majority of voters in a countywide referendum to have slot machines at such facility in the respective county; **[2]** any licensed pari-mutuel facility located within a county as defined in s. 125.011, provided such facility has conducted live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required license fee, and meets the other requirements of this chapter; or **[3]** any licensed pari-mutuel facility in any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or constitutional authorization after the

effective date of this section in the respective county, provided such facility has conducted a full schedule of live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter.

This statutory definition contains three clauses—indicated by the bold bracketed numerals—that address distinct circumstances. The first clause implements article X, section 23. It was adopted in 2005. See ch. 2005-362, § 1, Laws of Fla. The second and third clauses were both adopted in 2009. See ch. 2009-170, § 19, Laws of Fla.[1] The second clause pertains to facilities in counties "defined in s. 125.011"—that is, "any county operating under a home rule charter adopted pursuant to ss. 10, 11, and 24, Art. VIII of the Constitution of 1885, as preserved by Art. VIII, s. 6(e) of the Constitution of 1968, which county, by resolution of its board of county commissioners, elects to exercise the powers" conferred on such counties. § 125.011(1), Fla. Stat. (2013). The second clause has no referendum requirement. And it has no application to Gadsden County.

_____

1. Although the second and third clauses were adopted in 2009, their effective dates were expressly made contingent on, among other things, the ratification of a Gaming Compact between the Seminole Tribe of Florida and the State of Florida. See ch. 2009-170, § 26, Laws of Fla. The Gaming Compact was subsequently ratified during the 2010 legislative session, and the second and third clauses were then made effective as of July 1, 2010. See ch. 2010-29, §§ 4-5, Laws of Fla.

The controversy in this case in large part centers on the third clause. More particularly, it centers on whether Gadsden County is a "county in which a majority of voters have approved slot machines . . . in a countywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section." § 551.102(4), Fla. Stat. (2013). As we subsequently explain, we conclude that the third clause—properly understood—is dispositive. But first we briefly review the grounds for the Division's denial of a slot machine license to Gretna Racing, the ruling of the First District regarding those grounds, and the question of great public importance certified by the First District.

**II.**

The Division denied a slot machine gaming license to Gretna Racing based on the Division's conclusion that the requirements of neither section 551.104(2) nor the third clause of section 551.102(4) had been satisfied.

The Division ruled that the issuance of a license to Gretna Racing was foreclosed by section 551.104(2) because that section limits licenses to facilities in counties where the voters have approved slot machines as provided by article X, section 23 of the Florida Constitution, and Gadsden County is not within the ambit of article X, section 23. The Division thus rejected an argument made by Gretna Racing that the limitation imposed by section 551.104(2) was implicitly repealed

by the Legislature's subsequent adoption of the second and third clauses of section 551.102(4).

Concerning the third clause of section 551.102(4), the Division focused on the portion of the text referring to "a countywide referendum held pursuant to a statutory or constitutional authorization <u>after the effective date of this section</u>." (Emphasis added.) The Division interpreted this language as requiring that the "statutory or constitutional authorization" for a referendum be an authorization adopted "after the effective date" of the third clause. In adopting this interpretation, the Division relied on an opinion of the Attorney General. <u>See</u> Op. Att'y Gen. Fla. 2012-01 (2012) (concluding that "all pertinent considerations confirm that the Legislature intended that any statutory or constitutional authorization for a slots-approving referendum must occur after July 1, 2010, the effective date of the relevant portion of section 551.102(4), Florida Statutes"). The Division therefore rejected Gretna Racing's reliance on section 125.01(1)(y), Florida Statutes (2013), which permits the governing body of a county to conduct "straw ballots," because that "authorization" was adopted prior to the effective date of the third clause of section 551.102(4).

In upholding the Division's denial of the license, the First District summed up its decision as follows:

> Because the Gadsden County vote was not an authorized "referendum," amounting to only a non-binding vote of the electorate,

it has no binding legal effect. Moreover, nothing in the language, structure, or history of slot machine legislation, including section 551.102(4), Florida Statutes, provides authorization for the holding of slot machine referenda in counties other than Miami-Dade and Broward counties.

Gretna Racing, 178 So. 3d at 16. And the First District certified under article V, section 3(b)(4) of the Florida Constitution as a question of great public importance this question:

Whether the Legislature intended that the third clause of section 551.102(4), Florida Statutes, enacted in 2009, authorize expansion of slot machines beyond Miami-Dade and Broward Counties via local referendum in all other eligible Florida counties without additional statutory or constitutional authorization after the effective date of the act?

Id. at 29-30.

**III.**

On review, Gretna Racing has abandoned its specific argument that section 125.01(1)(y)'s provision for "straw ballots" constituted "authorization" within the meaning of the third clause of section 551.102(4). Instead, Gretna Racing argues that the "statutory or constitutional authorization" required by the third clause was provided under the "expansive scope of a non-chartered county's constitutional and statutory home rule powers" established by article VIII, section 1(f) of the Florida Constitution and section 125.01, Florida Statutes (2013). The Division points out that this is a "new argument" but does not urge that it is unpreserved and therefore waived. In any event, we conclude that the argument is unavailing and

that the failure of this argument is sufficient to resolve this case in favor of the Division.

To explain our decision on this point, we turn first to the text of the constitutional provision and the general statutory provisions relied on by Gretna Racing.

Article VIII, section 1(f) of the Florida Constitution provides:

> NON-CHARTER GOVERNMENT. Counties not operating under county charters shall have such power of self-government as is provided by general or special law. The board of county commissioners of a county not operating under a charter may enact, in a manner prescribed by general law, county ordinances not inconsistent with general or special law . . . .

Art. VIII, § 1(f), Fla. Const.

As the text specifies, the powers granted to non-charter counties are "such power[s] of self-government as [are] provided by general or special law." Id. The general law relied on by Gretna Racing is section 125.01(1), Florida Statutes (2013), which provides broadly that "[t]he legislative and governing body of a county shall have the power to carry on county government." The statute goes on to provide that the power to carry on county government, "[t]o the extent not inconsistent with general or special law, . . . includes, but is not restricted to, the power to" do certain enumerated things. § 125.01(1), Fla. Stat. (2013). Among those enumerated things is the power specified in subsection (1)(y) to conduct a "straw ballot." § 125.01(1)(y), Fla. Stat. (2013). But none of the enumerated

- 8 -

powers relate to slot machine gaming. Nor is a general power to conduct binding referenda among the enumerated powers.

Of course, the absence of a relevant enumerated power is not dispositive. In addition to the provision in section 125.01(1) that the "power to carry on county government . . . is not restricted to" the enumerated subjects, section 125.01(3)(a) provides that the enumeration of powers will "not be deemed exclusive or restrictive, but shall be deemed to incorporate all implied powers necessary or incident to carrying out such powers enumerated, including, specifically, authority to employ personnel, expend funds, enter into contractual obligations, and purchase or lease and sell or exchange real or personal property." Further, section 125.01(3)(b) contains a rule of liberal construction: "The provisions of this section shall be liberally construed in order to effectively carry out the purpose of this section and to secure for the counties the broad exercise of home rule powers authorized by the State Constitution." Which brings us back to the constitutional specification of "such power of self-government as is provided by general or special law," art. VIII, § 1(f), Fla. Const., and the general law provision of the "power to carry on county government" in a way that is "not inconsistent with general or special law," § 125.01(1), Fla. Stat. (2013).

Based on the analysis we employ to resolve this case, we reframe the certified question as follows:

Is a referendum conducted by a non-charter county concerning approval of slot machine licenses at pari-mutuel facilities authorized by the general powers conferred on non-charter counties by article VIII, section 1(f) of the Florida Constitution and section 125.01(1), Florida Statutes (2013)?

An affirmative answer to this question could only be given if we conclude that conducting such a referendum regarding the issuance of slot machine licenses by the Division is inherent in the "power to conduct county government."

**IV.**

In support of its position on this point, Gretna Racing relies on two decisions upholding the authority of a county to conduct a referendum—Speer v. Olson, 367 So. 2d 207 (Fla. 1978), which approved the issuance of bonds authorized by a referendum for the expansion of sewer and water systems, and Watt v. Firestone, 491 So. 2d 592 (Fla. 1st DCA 1986), which rejected a challenge to a ballot initiative for a constitutional amendment authorizing casino gambling in certain areas if approved in an initiative referendum by county voters. An examination of these cases shows that they do not support Gretna Racing's argument. In both cases, the authorization to conduct a referendum did not stem from the general home rule power conferred by section 125.01(1). Instead, the authority to conduct the referendum in each of the two cases was based on specific constitutional or statutory authority to act on a subject that required approval by referendum. Here,

- 10 -

in contrast, there is no specific constitutional or statutory authority for Gadsden County to act on the subject of slot machine gaming.

In Speer, Pasco County had "enacted an ordinance creating a Municipal Service Taxing Unit . . . composed of the entire unincorporated area of the county." Speer, 367 So. 2d at 208. The county had "called a special election by the residents of the Unit for the purpose of securing their approval for the issuance of . . . general obligation bonds by the Unit." Id. The purpose of the issuance of the bonds was "for the expansion of sewer and water systems." Id. In rejecting the claim that the referendum was unauthorized, we referred to the enumerated power provided in section 125.01(1)(k), Florida Statutes, to "[p]rovide and regulate waste and sewage collection and disposal, water supply, and conservation programs." Speer, 367 So. 2d at 208-09. We also referred to the power in section 125.01(1)(q) to create municipal service taxing units for various purposes including "water" and "waste and sewage collection and disposal," which includes "the authorization for all counties to levy additional taxes, within the limits fixed for municipal purposes, within such municipal service taxing units under the authority of the second sentence of Article VII, Section 9(b) of the State Constitution."[2] Speer, 367 So. 2d

---

2. That "second sentence" of article VII, section 9(b) of the Florida Constitution provides as follows: "A county furnishing municipal services may, to the extent authorized by law, levy additional taxes within the limits fixed for municipal purposes."

at 209. Finally, we pointed to article VII, section 12(a) of the Florida Constitution, which provides that local government entities

> with taxing powers <u>may issue bonds</u>, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only: (a) to finance or refinance <u>capital projects authorized by law</u> and only when <u>approved by vote of the electors</u> who are owners of freeholds therein not wholly exempt from taxation.

<u>Speer</u>, 367 So. 2d at 211-12 (emphasis added) (quoting art. VII, § 12(a), Fla. Const.).

> We noted the following:

> There is no statute, general or special, which either specifically authorizes or restricts Pasco County with respect to the issuance of general obligation bonds to acquire sewage and water systems and to pledge for their payment the net revenues to be derived from the operation of such facilities and ad valorem taxes levied within the area of the Unit.

<u>Id.</u> at 211. We concluded that "[t]he first sentence of Section 125.01(1), Florida Statutes (1975), therefore, empowers the county board to proceed under its home rule power to accomplish this purpose," and that "[t]his was done by the enactment of the ordinance and the adoption of the bond resolution after the bond election." <u>Id.</u> We thus recognized that the issuance of general obligation bonds to finance capital expenditures for purposes specifically authorized under section 125.01(1) was part and parcel of the "power to carry on county government." This point is, of course, reinforced by the recognition in article VII, section 12(a) of the Florida

Constitution of the power of local governments to issue bonds pledging ad valorem taxes "for capital projects authorized by law."

And we went on to hold—on the point of particular relevance here—that the provision of article VII, section 12(a) regarding elections to approve bonds was "implemented" by the provision of the ordinance establishing the municipal services taxing unit,

> which requires that the issuance of bonds for which the full faith and credit of the Unit shall have been pledged as additional security, shall be approved at an election of the qualified electors residing in the Unit, such election to be called, noticed and conducted in the manner provided in the Florida Constitution and statutes for elections.

Speer, 367 So. 2d at 212. We reasoned as follows:

> Since the bonds proposed to be issued by the county pledge both net revenues to be derived from the operation of the combined water and sewer system and ad valorem taxes to be levied and collected in the area of the Unit, it was necessary to hold a bond election as part of the authorization for their issuance.

Id. (emphasis added). The authority to conduct the referendum on the issuance of the bonds was therefore directly based on article VII, section 12(a)—and not on a broad home rule authority to conduct a referendum on any subject.

Watt addressed removal from the ballot of a proposed constitutional amendment providing for casino gambling if approved by initiative referendum of county voters. Removal was sought on the ground that the proposed amendment violated due process because of "the alleged lack of authority, by statute or

- 13 -

ordinance, for many of Florida's counties to conduct initiative referenda." Watt, 491 So. 2d at 593. The challengers thus contended that "many Floridians would be unable to implement casino gambling in their own counties because an initiative referendum on the subject could not be held." Id.

The First District in Watt rejected this argument, reasoning as follows:

Charter counties have the authority to conduct such referenda under Article VIII, section 1(g) of the Florida Constitution and non-charter counties have similar power under Article VIII, section 1(f) of the state constitution and section 125.01 of the Florida Statutes. Even if some counties do not have currently valid ordinances to spell out the specifics of holding a referendum, we hardly find this to be grounds for invalidating a proposed constitutional amendment. If the proposal is approved and the governing body of a county fails to provide for referenda, an aggrieved citizen could seek redress in the courts.

Id.

We reject the suggestion that Watt supports a broad home rule authority to conduct binding referenda on any and every subject. Watt's discussion of the legal powers of counties cannot be divorced from the authorization of initiative referenda in the proposed constitutional amendment. Watt simply holds that if a constitutional provision authorizes initiative referenda in certain counties then those counties will—under the general authority to exercise the power of self-government—have the power to establish the mechanism necessary to implement the constitutional provision. As in Speer, the authority to conduct a binding

- 14 -

referendum was predicated on a constitutional provision empowering counties to conduct referenda on a particular subject.

Here, no relevant analogous constitutional authority exists regarding the subject of slot machine gaming. As the Division points out, in Florida gambling is generally illegal. Section 849.08, Florida Statutes (2013), provides that "game[s] of chance" are illegal. But certain forms of gambling are legal. See, e.g., ch. 550, Fla. Stat. (2013) (the "Florida Pari-mutuel Wagering Act"). And although slot machines and slot machine gaming are specifically outlawed under section 849.15(1), Florida Statutes (2013), in sweeping terms, slot machine gaming is permitted under tight restrictions as laid out by the Legislature in chapter 551. Nothing in chapter 551, however, grants any authority to regulate slot machine gaming to any county. The only role that counties play regarding slot machine gaming is conducting referenda when authorized by law.

Under the third clause of section 551.102(4), there must be "statutory or constitutional authorization" for any countywide referendum approving slot machines at qualifying pari-mutuel facilities. The third clause requires such a "statutory or constitutional authorization" but does not itself create the authorization. The authorization must be found elsewhere in the law. And it is nowhere to be found. It cannot be derived from the power of counties to "carry on county government," since slot machine gaming is not the business of county

- 15 -

government unless a constitutional or statutory provision has specifically made it the business of county government to conduct a referendum on the subject. In the absence of such a specific authorization, a county cannot initiate a referendum that will authorize the Division to issue a license any more than the county could itself issue a slot machine gaming license.

## V.

The general power of non-charter counties to "carry on county government" does not constitute authorization to conduct a referendum to approve slot machine gaming. The referendum conducted by Gadsden County regarding slot machine gaming therefore was not conducted pursuant to a "statutory or constitutional authorization" as required by section 551.102(4). Because the referendum was invalid, Gretna Racing was not an "eligible facility" under the statute. The First District thus was correct in upholding the Division's decision to deny the license sought by Gretna Racing. So we approve the result reached by the First District and answer the rephrased certified question in the negative.

It is so ordered.

LABARGA, C.J., and PARIENTE, POLSTON, and LAWSON, JJ., concur.
LEWIS, J., concurs in result with an opinion.
QUINCE, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

- 16 -

LEWIS, J., concurring in result.

Although I concur in the result reached by the majority, I write separately to explain in more simple and direct terms the reason why Gretna is not entitled to a license to conduct slot machine gambling. There can be no doubt that the legislative amendments and in futuro provisions have added to the confusion in this area of the law.

Aside from an amendment to the Florida Constitution that authorizes slot machine gambling in certain counties if a referendum approving slot machines is held in those counties, see art. X, § 23, Fla. Const. (2004), and certain implementing statutes in chapter 551 of the Florida Statutes, slot machine gambling is generally banned and criminalized by chapter 849 of the Florida Statutes. See § 849.08, Fla. Stat. (2013) ("Whoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."); § 849.15(1), Fla. Stat. (2013) ("It is unlawful: (a) to manufacture, own, store, keep, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to sell, rent, lease, let on shares, lend or give away, or permit the operation of, or for any person to permit to be placed, maintained, or used or kept in any room, space, or building owned, leased or occupied by the

- 17 -

person or under the person's management or control, any slot machine or device or any part thereof."); see also §§ 849.16, .17-.21, Fla. Stat. (2013) (defining slot machines, providing a rebuttable presumption that such a machine is "a prohibited slot machine," providing for confiscation of slot machines by an arresting officer, providing for destruction of slot machines upon conviction, providing for no property rights in a confiscated machine, declaring slot machines and slot machine locations a nuisance, and providing a cause of action for an injunction against such a nuisance); but see § 849.235, Fla. Stat. (2013) (providing a statutory defense for antique slot machines not used for gambling).

Thus, in light of that framework, the salient issue in this case is whether any other statutory or constitutional provision authorizes counties to supersede this general ban on slot machines by holding a referendum. Gretna has asserted that expansion of the definition of "eligible facility" in chapter 551 provides such an authorization. Specifically, "eligible facilities" now also include in pertinent part "any licensed pari-mutuel facility in any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section in the respective county." § 551.102(4), Fla. Stat. (2013). However, by its own plain language, this expanded definition is not self-executing as it requires a "statutory or constitutional authorization." While it appears the Legislature has

- 18 -

taken a highly unusual path in providing an expanded definition of eligible facility that will not currently apply to any existing factual predicate but rather will apply and enable a future factual circumstance, that appears to be exactly what the Legislature has done here. Because slot machines are generally prohibited, Gadsden County does not have and cannot assert home rule powers as a basis to support a referendum on slot machine gambling. In Florida, non-charter counties, such as Gadsden County, "shall have such power as is provided by general or special law" and "may enact, in a manner prescribed by general law, <u>county ordinances not inconsistent with general or special law</u>." Art. VIII, § 1(f), Fla. Const. (emphasis added); <u>see also</u> § 125.01(1), Fla. Stat. (2013) ("(1) The legislative and governing body of a county shall have the power to carry on county government. <u>To the extent not inconsistent with general or special law</u>, this power includes, but is not restricted to, the power to: . . . ." (emphasis added)). Thus, Gretna's reliance on <u>Watt v. Firestone</u>, 491 So. 2d 592 (Fla. 1st DCA 1986), for the proposition that Gadsden County's non-charter home rule powers includes that power and authorizes it to conduct a referendum approving slot machines over general law is misplaced.

For those reasons, I concur in the result.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

First District - Case No. 1D14-3484

- 19 -

David S. Romanik of David S. Romanik, P.A., Oxford, Florida; and Marc W. Dunbar, Tallahassee, Florida,

    for Petitioner

Pamela Jo Bondi, Attorney General, and Denise M. Harle and Jonathan L. Williams, Deputy Solicitors General, Tallahassee, Florida,

    for Respondent

Philip J. Padovano of Brannock & Humphries, Tallahassee, Florida,

    for Amicus Curiae City of Gretna

John M. Lockwood and Kala Kelly Shankle of The Lockwood Law Firm, Tallahassee, Florida,

        for Amici Curiae Investment Corporation of Palm Beach, Bonita-Fort Myers Corporation, and Melbourne Greyhound Park, LLC

David J. Weiss of Ausley & McMullen, P.A., Tallahassee, Florida,

    for Amicus Curiae Gadsden County

Dan Gelber, Adam Schachter, and Freddy R. Funes of Gelber Schachter & Greenberg, P.A., Miami, Florida,

    for Amicus Curiae Honorable Daniel Robert "Bob" Graham

David K. Miller of Broad and Cassel, Tallahassee, Florida, and Mark M. Barber of Broad and Cassel, Tampa, Florida,

    for Amicus Curiae No Casinos, Inc.