# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-3266
_____

CITY OF GAINESVILLE, FLORIDA
d/b/a GAINESVILLE REGIONAL
UTILITIES,

    Appellant,

    v.

PARKWOOD ALACHUA LAND
INVESTMENTS, INC.,

    Appellee.

_____

On appeal from the Circuit Court for Alachua County.
Donna M. Keim, Judge.

April 8, 2026

ON MOTION FOR REHEARING

BILBREY, J.

We grant the motion for rehearing from Appellee Parkwood Alachua Land Investments, Inc., withdraw our previous opinion issued October 1, 2025, and substitute the following in its place.[1]

---

[1] We address the dissent's contention that rehearing should be denied at the conclusion of this opinion.

As a result, Parkwood's motion for certification of conflict is denied as moot.

This case concerns a breach of contract suit brought by Parkwood against the City of Gainesville, Florida d/b/a Gainesville Regional Utilities (GRU). Parkwood purchased land in Alachua County for residential and commercial development. As developer, Parkwood was required to purchase water and wastewater services from GRU. It had to construct a lift station, also called a pump station, along with a force main to receive those services.

The lift station was constructed to raise wastewater from the development so that it would flow in GRU's gravity system. The force main that was constructed was "a principal conduit (as in a sewer system) through which water is pumped as distinguished from one through which it flows by gravity." *Force main*, Webster's Third New International Dictionary (1993). Upon completion, other GRU customers also would be allowed to use the lift station and force main if there was excess capacity.

The parties had a written contract. The contract began with unnumbered paragraphs that stated as follows:

> The City of Gainesville/Gainesville Regional Utilities, (GRU) has established policies within its Code of Ordinances to ensure the development of wastewater collection systems that service the public in a coordinated and efficient manner. The Ordinances provide the mechanisms to allow for the reimbursement to the developer for certain constructed facilities when these facilities are utilized to provide utility service to properties outside the original development.

> The Applicant named above [Parkwood], is the developer of certain wastewater pumping and/or wastewater collection facilities serving the above named project.

> The City through its utility systems, Gainesville Regional Utilities (GRU), has determined that the wastewater facilities installed by the Applicant will provide utility service to properties outside the above named project,

2

provided that capacity is available at the time this service is required.

In consideration of the foregoing and the mutual promises set out below the parties agree to the following:

The contract then stated the parties' obligations in numbered paragraphs. Paragraphs 9 and 10 concerned GRU's obligations at issue here, and stated as follows:

9. Following completion and acceptance by GRU of the water distribution and/or wastewater pumping and collection facilities constructed on the above named project(s) and upon receipt from the Applicant of the engineer's certified cost estimate and the contractor's final signed contract unit prices and quantities, and provided that all conditions of this agreement have been satisfactorily met, Gainesville Regional Utilities shall; 1) charge a lift station rebate fee to any properties discharging flow to the applicants [sic] lift station provided that the discharging party is able to connect to the applicants [sic] collection system without the aid of any pumping systems; and 2) charge a force main rebate fee to any properties connecting directly to the applicants [sic] force main.

10. The rebate fee(s) will be charged at the agreed upon rate for the number of equivalent residential connections which are actually connecting to the applicant's system. Connections to the pump station shall pay the pump station rebate charge and 100% of the off-site and on-site force main rebate charge. Connections to the force main at a point located on the proposed development property shall pay 50% of the total force main rebate charge. Connections to the force main at a point which is located outside of the proposed development property shall pay 50% of the off-site force main rebate charge as listed below.

In the breach of contract suit, Parkwood alleged that based on the plain language in paragraph 9 of GRU's obligations, the lift station rebate fee was due from GRU when anyone connected to

3

the lift station. GRU countered that it owed that rebate fee to Parkwood only when there was a connection to the lift station from an outside development. GRU's argument was based on the unnumbered paragraphs at the start of the contract quoted above.

After a nonjury trial, the court held that the initial language in the contract on which GRU relied, concerning the rebates for the provision of service to "properties outside the above named project," was merely prefatory and not binding. According to the trial court, GRU owed rebate fees under paragraph 9 of the contract any time there was a connection to the lift station, regardless of whether the connection came from within or outside of Parkwood's development. The trial court stated this in the final judgment:

> 20. Although these paragraphs do not contain "whereas" language, the context indicates that these are indeed prefatory paragraphs as they are at the beginning of the agreement, are set apart from the rest of the contract, do not contain a heading, and do not contain numbers as the other sections of the contract do. The last paragraph of this section states "In consideration of the foregoing and mutual promises set out below the parties agree to the following." *See Johnson v. Johnson*, 725 So. 2d 1209, 1212 (Fla. 3d DCA 1999) (holding that prefatory recitations contained in various "whereas" clauses are not binding, operative provisions to an otherwise unambiguous contract); *Orlando Lake Forest Venture v. Lake Forest Master Community*, 105 So. 3d 646, 648 (Fla. 5th DCA 2013) (holding that whereas clause is prefatory and nonbinding where the agreement is clearly arranged in a manner to separate the recitals from the operative portions, which are expressed in detailed numbered articles).

> 21. Since the first four paragraphs of the Agreement are prefatory, they may not be relied upon if they will cause ambiguity in an otherwise unambiguous contract. As set forth in the above analysis, the Agreement is unambiguous without looking to the prefatory provisions.

4

Based on this reasoning, the trial court awarded $132,901 to Parkwood in the suit, and this appeal followed. Because the trial court correctly found that the initial language in the contract was prefatory and could not be used to create an ambiguity in the remainder of the contract, we affirm the final judgment.

"A trial court's interpretation of a contract is a matter of law and is thus subject to de novo review." *Philip Morris USA, Inc. v. Freeman*, 285 So. 3d 999, 1001 (Fla. 1st DCA 2019). In interpreting a contract we consider the entire agreement. *See Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009). But the prefatory clauses at the start of a contract are "not an operative provision of an otherwise unambiguous agreement." *Johnson*, 725 So. 2d at 1212 (citations omitted). To the extent that there is any conflict between the prefatory language and the operative provisions of the contract, the operative provisions prevail. *See N. Tr. Co. v. King*, 6 So. 2d 539, 540 (Fla. 1942) (citing 17 C.J.S., Contracts, § 314, p. 733) ("The question then arises whether we will be governed by the recital or the operative clause. The law appears settled that where there is a difference in the recital and covenant, the covenant will prevail.").

The *Orlando Lake Forest Venture* case that the trial court cited in the final judgment is instructive. Similar to here, the issue there was whether the prefatory language in a contract restricted the broader language in the operative part. 105 So. 3d at 647–48. The specific issue in *Orlando Lake Forest Venture* was whether the mention of a shopping center in the prefatory language of the contract concerning development of a property restricted development to a shopping center, notwithstanding the lack of any restriction in the operative part of the contract. The court in *Orlando Lake Forest Venture* held, "Even assuming that Appellee's proffered construction of the whereas clause manifests an intent to restrict the development of all of Appellant's property to a shopping center, we conclude that the whereas clause is prefatory and not binding." *Id.* at 648. The court further stated, "The operative portion of the document is both comprehensive and unambiguous. Under these circumstances, the prefatory language should not be considered to vary the unambiguous terms of the operative portion of the document." *Id.* (citing *Johnson*, 725 So. 2d at 1212–13).

5

Statutes are interpreted in the same manner as contracts. *Crapo v. Univ. Cove Partners, Ltd.*, 298 So. 3d 697, 700 (Fla. 1st DCA 2020). In construing statutes, the Florida Supreme Court has recognized the limitation of prefatory language, stating "It is well settled that such 'prefatory language' cannot expand or restrict the otherwise unambiguous language of a statute." *Dorsey v. State*, 402 So. 2d 1178, 1180 (Fla. 1981). "Although prefatory language may aid a court to determine legislative intent when the operative terms of a provision of law are ambiguous, such language does not control interpretation of the operative terms of that provision." *Dep't of State v. Florida Greyhound Ass'n, Inc.*, 253 So. 3d 513, 521 (Fla. 2018) (citing *Dorsey*, 402 So. 2d at 1180).

Likewise, "[t]he rules used in construing statutes are in general applicable in construing the provisions of a Constitution." *State ex rel. McKay v. Keller*, 191 So. 542, 545 (Fla. 1939). In construing the Second Amendment to the United States Constitution, the Supreme Court held, "That requirement of logical connection may cause a prefatory clause to resolve an ambiguity in the operative clause. . . . But apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause." *District of Columbia v. Heller*, 554 U.S. 570, 577–78 (2008) (citations omitted).

A final reason that the prefatory language does not apply here is the different language used in paragraphs 9 and 10 of the contract. In discussing the force main rebate, the contract distinguished between "on-site" and "off-site" properties connecting to the force main. Nowhere in the operative language of the contract is a distinction made between on-site and off-site properties when discussing the lift station rebate fee. "As a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended." *Holmes v. Florida A & M Univ. By & Through Bd. of Trustees,* 260 So. 3d 400, 406 (Fla. 1st DCA 2018) (quoting *Kel Homes, LLC v. Burris*, 933 So.2d 699, 703 (Fla. 2d DCA 2006)). Had GRU wanted to allow the lift station rebate fee to apply only to off-site connections to the lift station, it could have easily made that distinction rather than have the lift station rebate fee apply to "any properties discharging flow to the applicants lift station."

6

Here, the trial court correctly found that the language at the start of the contract was prefatory, not operative, and could not be used to create an ambiguity where none existed in the body of the contract. As a result, we affirm the well-reasoned judgment of the trial court.

\* \* \*

The dissent contends that we should deny rehearing because Parkwood did not identify what the original panel opinion "overlooked or misapprehended" so as to allow rehearing under rule 9.330(a)(2)(A), Florida Rules of Appellate Procedure. While the original opinion did not overlook anything, it misapprehended the impact of prefatory language on the interpretation of an otherwise unambiguous contract. When a panel opinion misapprehends a determinative legal issue, rehearing is authorized and appropriate. *See Gretna Racing, LLC v. Dep't of Bus. & Prof'l Regulation*, 178 So. 3d 15, 31 n.11 (Fla. 1st DCA 2015) (on motion for rehearing) (Bilbrey, J., concurring), *approved sub nom. Gretna Racing, LLC v. Florida Dep't of Bus. & Prof'l Regulation*, 225 So. 3d 759 (Fla. 2017) ("'Misapprehend' or 'misapprehended' is not defined the Florida Rules of Appellate Procedure or in *Black's Law Dictionary*. 'Misapprehend' is defined by the *Oxford English Dictionary* (2nd ed. 1989) as 'to apprehend wrongly; not to understand rightly; to attach a wrong meaning to.'"); *see also Charles v. State*, 204 So. 3d 63, 68 (Fla. 4th DCA 2016) (on motion for rehearing) (Levine, J., concurring) ("[R]ehearing is also appropriate under rule 9.330(a) if the original decision 'misapprehended some point of law or fact.'"). The original panel dissent is appended after the appendix provided in Judge Winokur's opinion.

AFFIRMED.

KELSEY,[2] J., concurs; WINOKUR, J., dissents with opinion.

---

[2] Judge Kelsey was substituted for an original panel member in this proceeding after the initial opinion issued.

7

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

WINOKUR, J., dissenting.

The central disagreement in this appeal concerned the effect of a clause of a contract between the parties that was considered "prefatory." The trial court ruled that the disputed clause, which appeared to benefit Appellant City of Gainesville ("the City") in this action, had no effect on the proper interpretation of the contract for purposes of this action, and ruled in favor of Appellee Parkwood Alachua Land Investments, Inc. ("Parkwood"). The City appealed. Initially, we reversed the judgment and ruled in favor of the City. Parkwood then moved for rehearing, which this court has granted. We have withdrawn the prior decision and affirmed the judgment, ruling in favor of Parkwood. I disagree that Parkwood has presented a legitimate basis for rehearing and find that we were, therefore, bound to deny the motion for rehearing.

The rules of appellate procedure plainly describe the grounds that may support rehearing: "A motion for rehearing shall state with particularity the points of law or fact that, in the opinion of the movant, the court has overlooked or misapprehended in its order or decision." Fla. R. App. P. 9.330(a)(2)(A). Parkwood does not claim that this court "overlooked" or "misapprehended" anything. Instead, Parkwood simply argues that this court got it wrong—repeating its original position that the "prefatory" language in the contract should not control the outcome of this case. The portion of its motion that specifically addresses its basis for rehearing is set out in full here:

> The Opinion Mistakenly Treats the Recital
> Clauses as Operative Provisions through which
> to Read into the Contract Terms Not Present in
> the Specific Contractual Clause at Issue

8

"Under Florida law, an operative clause of an agreement prevails over the recital clause when there is a discrepancy between the two." *Johnson v. Johnson*, 725 So. 1209, 1213 (Fla. 3d DCA 1999). "Although prefatory language may aid a court to determine legislative intent when the operative terms of a provision of law are ambiguous, such language does not control interpretation of the operative terms of that provision." *Dep't of State v. Fla. Greyhound Ass'n, Inc.*, 253 So. 3d 513, 521 (Fla. 2018) (citing *Dorsey* [*v. State*, 402 So. 2d 1178, 1180 (Fla. 1981)].

The Court, however, relied on a more general proposition of law in making its determination to reverse the trial court. That general proposition requires the consideration of the whole contract in determining the intent of the parties. Opinion at 7-8 (citing *Fla. Power Corp.* [*v. City of Tallahassee*, 18 So. 2d 638, 674 (Fla. 1944)]; *Orlando Orange Groves Co.* [*v. Hale,* 161 So. 284, 294 (Fla. 1935)] (the "main principle" in construing a contract is to deduce the intention of the parties "from consideration of the whole instrument").

The Court's reliance on the recital or prefatory statements does violence to the specific contractual clauses that operate here, and at bottom departs from the essential principle of the "supremacy of the text" doctrine. Which is to say, in sum, the Opinion does not give the operative text the supremacy it is due. Rehearing is warranted.

This is the full portion of the motion setting forth legal argument that rehearing is warranted.[1] Again, Parkwood does not bother to identify "with particularity" any points of law or fact that we "overlooked or misapprehended;" it merely argues, as it did in its briefs before this court, that reliance on "prefatory" contract language was improper. We cannot transform Parkwood's

[1] Parkwood also moved for certification of conflict and provided separate reasoning for that request, but the above-quoted passage is its entire argument in support of rehearing.

9

argument into a claim that this court overlooked or misapprehended a point of law or fact.

Parkwood candidly admits that the original dissenting opinion "informs" its motion for rehearing and simply asked that we "adopt the dissenting opinion." But while the original dissent may have provided a fair argument in support of affirmance, the original majority understood precisely what Parkwood (and the dissenting opinion) was arguing.[2] Reaching a different conclusion than the one favored by the losing party and a dissenting judge is not equivalent to a claim that the majority opinion "overlooked" or "misapprehended" a point of fact or law, as those terms are used in the rule. If it did, then nearly every litigant would be permitted to seek rehearing merely by rearguing their case or expressing agreement with a dissenting opinion. This practice, however, is not permitted, as numerous cases have explained, as I set forth below. Instead, a motion for rehearing "must address some error or omission in the resolution of an issue previously presented in the main argument." Philip J. Padovano, Rehearing, 2 Fla. Prac., Appellate Practice § 21:2 (2026 ed.). Parkwood has not claimed that we misunderstood the record or misread an applicable statute or case. This is what "misapprehended" means, as that term is used in rule 9.330(a).

This court has repeatedly held that a rehearing is not simply a vehicle to reargue the merits of the appeal or to express disagreement with the disposition. Rehearing is not meant "to furnish a medium through which counsel may advise the court that they disagree with its conclusion, to reargue matters already discussed in briefs and oral argument and necessarily considered by the court, or to request the court to change its mind as to a matter which has already received the careful attention of the

---

[2] A review of the original majority opinion, attached as an appendix to this opinion, demonstrates that we did not overlook or misapprehend any point of law or fact identified by Parkwood. Rather, we understood the arguments and reached a conclusion, albeit one contrary to Parkwood's position. I continue to believe that this original opinion correctly analyzes the issue presented and correctly concludes that reversal is warranted.

10

judges, or to further delay the termination of litigation." *State ex rel. Jaytex Realty Co. v. Green*, 105 So. 2d 817, 819 (Fla. 1st DCA 1958). Stated differently, "rehearing is not an open invitation for an unhappy litigant or attorney to reargue the same points previously presented, or to discuss the bottomless depth of the displeasure that one might feel . . . as a result of having unsuccessfully sought appellate relief." *Unifirst Corp. v. City of Jacksonville*, 42 So. 3d 247, 248 (Fla. 1st DCA 2009) (citation omitted). *See also Dep't of Revenue v. Leadership Hous., Inc.*, 322 So. 2d 7, 9 (Fla. 1975) ("The proper function of a [motion] for rehearing is to present to the court in clear and concise terms some point that it *overlooked or failed to consider*; *only this and nothing more*") (emphasis supplied); *Strand v. Escambia Cnty.*, 992 So. 2d 150, 162 (Fla. 2008) (Lewis, dissenting) (criticizing motions for rehearing used "as a means to reargue and attack the merits of [the] Court's decision, which [have been] previously considered and determined.").

These cases accurately describe Parkwood's motion for rehearing. Again, this court did not misunderstand the record or misread any statutes or cases. We carefully considered Parkwood's argument, but rejected it. The fact that our disposition included a dissenting opinion does not alter that conclusion. Repeating the argument to us in a motion for rehearing, even with a reminder that a judge dissented, does not demonstrate at all that rehearing is warranted. Granting rehearing in these circumstances ignores decades of cases clearly establishing the correct and important limitations to such motions. We should deny the motion.

**APPENDIX**

Tanenbaum, J.

This is a breach-of-contract case. When we are called to assess a trial court's enforcement of a contract's terms, as we are here, the supreme court tells us that we are "bound by the plain meaning of the contract's text." *Allstate Ins. Co. v. Revival Chiropractic, LLC*, 385 So. 3d 107, 113 (Fla. 2024) (internal quotations and citation omitted). One or more provisions in a contract's text, however, "cannot be viewed in isolation from the full textual context of which they are a part." *Id.* Rather, "proper interpretation requires consideration of 'the entire text, in view of its structure and of the physical and logical relation of its many parts.'" *Id.* (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 167 (2012)). This is so because "the goal of interpretation is to arrive at a fair reading of the text by determining the application of the text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 323–24 (Fla. 2022) (internal quotations and brackets omitted). "*Context* is a primary determinant of meaning." *Id.* at 324 (citing Scalia & Garner, Reading Law at 167) (emphasis supplied).

At issue here is whether initial paragraphs in the parties' contract—paragraphs that do not define either party's rights or obligations—can still be used to provide context governing the meaning of otherwise plain text appearing under the City of Gainesville's (as the going concern known as Gainesville Regional Utilities, or "GRU") specified obligation to pay rebate fees to the developer Parkwood Alachua Land Investments, Inc. ("Parkwood"), when certain conditions precedent occur. There was a bench trial, after which the judge applied the operative text literally, without considering the prefatory language for context, and rendered judgment against GRU for money due under the contract. GRU argues a different plain meaning of the text, basing its reading on the clear purpose of the whole contract, which is spelled out by introductory (or prefatory) language. Following the supreme court's lead regarding "whole text," or contextual,

application of statutory and contractual provisions, we agree with GRU and reverse.

I

GRU and Parkwood executed a Lift Station/Force Main Reimbursement Agreement on February 18, 2020 ("Lift Station Agreement"). But the relationship between the parties began a couple years earlier. In 2018 Parkwood initiated construction of Newberry Park—a mixed-use development community in Alachua County. The development would accommodate both residential units and commercial establishments, including two apartment buildings, a daycare, a gas station, a restaurant, and a grocery store. Parkwood anticipated building 300 residential units and needed, among other things, wastewater service to support them. GRU (operating on behalf of the city) conditioned permitting the project on Parkwood's designing and constructing wastewater facilities that would do that and feed into GRU's collection system. As part of this, Parkwood had to install underground piping and a lift station, and after completion, Parkwood would convey the infrastructure to GRU for service and maintenance.[1]

Regarding the underground piping, GRU asked that Parkwood enlarge and extend the piping system beyond what was needed for the planned development so that future, bordering developments potentially could tie into the system installed by Parkwood. GRU and Parkwood entered an "Oversizing Agreement," under which Parkwood would provide GRU its estimate of cost to install the minimum piping system necessary to support its own development and the incremental costs associated with GRU's request for increased capacity. GRU then would reimburse Parkwood for that excess incurred cost—which it ultimately did, in the amount of $31,394.

Meanwhile, the lift station Parkwood built needed to be sized only for the anticipated need within the planned development. In

---

[1] No one disputes what a "lift station" is here. Basically, it is a pump in the ground that lifts wastewater from a lower to higher elevation to utilize gravity in facilitating the flow of wastewater toward a treatment facility.

other words, GRU did not ask that Parkwood oversize the lift station like it did for the piping. Parkwood installed the lift station at a cost of $207,531. A lift station's capacity is measured in "equivalent residential units," or "ERUs"—the amount of wastewater emitted by an average residence. Parkwood's station could accommodate 473 ERUs, but the development would need only 170 ERUs. This is where the disputed contract comes in.

Under the Lift Station Agreement, once Parkwood completed the lift station and wastewater facilities, it would transfer ownership of them over to GRU, at which point GRU would be solely responsible for their operation and maintenance. GRU was to review Parkwood's lift station "capacity" and "construction costs and establish an eligible amount for reimbursement." The amount would be fixed once calculated "based upon [Parkwood's] actual cost and the estimated system capacity of facilities paid for by [Parkwood]," and it would be "collected on an equivalent residential connection, ERC [or ERU] basis." The calculated pump-station rebate amount was $439 per ERC. Parkwood would "be entitled to the reimbursement for a period of ten years" or "until such time as [Parkwood] receives the accumulated maximum rebate amount"—so, until February 2030 or until $132,901 has been rebated, whichever occurs first.[2]

There are three initial paragraphs in the Lift Station Agreement, all of which precede numbered paragraphs that fall under one of two headings: "[Parkwood's] Obligations" and "[GRU's] Obligations." The first paragraph states that policies are in place "to ensure the development of wastewater collection systems that service the public in a coordinated and efficient manner." It continues by stating there are "mechanisms" in place "to allow for the reimbursement to the developer for certain constructed facilities when these facilities are utilized to provide utility service to properties outside of the original development." The third paragraph provides that GRU "has determined that the

---

[2] Divide $132,901 by the rebate fee per ERC of $439, and you get roughly 303 ERCs, which is the difference between the lift station's capacity (473 ERUs or ERCs) and Newberry Park's estimated need (170 ERUs or ERCs).

wastewater facilities installed by [Parkwood] will provide utility service to properties outside [Newberry Park], provided that capacity is available at the time this service is required." These initial paragraphs are punctuated by the following commonplace contractual statement: "In consideration of the foregoing and the mutual promises set out below the parties agree to the following [obligations.]"

Notwithstanding these paragraphs, Parkwood's suit averred that GRU owed it the full $132,901 because GRU had collected connection fees for properties within Newberry Park for use of the wastewater facilities built and transferred by Parkwood. Its position hinged on two provisions in the Lift Station Agreement, both listed under the heading, "[GRU] Obligations." The first (paragraph nine) stated that once GRU accepted the "wastewater pumping and collection facilities constructed" by Parkwood at Newberry Park, GRU was to

> charge a lift station rebate fee to *any* properties discharging flow to the applicants [*sic*] lift station provided that the discharging party is able to connect to the applicants [*sic*] collection system without the aid of any pumping systems . . . . (emphasis supplied).

The second provision (paragraph ten) stated that the

> rebate fee(s) will be charged at the agreed upon rate for the number of [ERCs] which are *actually connecting* to [Parkwood's] system. Connections to the pump station shall pay the pump station rebate charge and 100% of the off-site and on-site force main rebate charge . . . . (emphasis supplied).

The contract also requires GRU to "reimburse the total amount of the rebate fees collected to [Parkwood] within 60 days of receipt of the rebate fees." According to Parkwood, the initial paragraphs were no more than "prefatory" and could not inform or alter what it considered to be the plain and unambiguous terms "any properties" and "actually connecting."

At the bench trial, Parkwood put on a case to show that GRU collected $379,264.12 in "Wastewater Connection" fees from the

15

successor entity that acquired most of the development property from Parkwood and completed the build-out of Newberry Park— Newberry Park Properties, LLC.[3] Even though GRU denied collecting any lift-station rebate fees from anyone, Parkwood claimed the connection fee collected from Newberry Park Properties was the equivalent of the fee contemplated by the Lift Station Agreement—which was to be charged "to *any* properties discharging flow to" the lift station it installed and that "are *actually* connecting" to the lift station. (emphases supplied). For Parkwood, this language clearly entitled it to be reimbursed for connection to and use of the lift station from within the development for which Parkwood originally installed the station— so clear, in fact, that the trial judge should not consider the initial paragraphs providing the contract's purpose and context.

The trial judge reached the same conclusion. She determined that, while the term "rebate fee" is not defined in the contract and that there is no dictionary definition of that term, it nevertheless appeared that GRU received "payment of connection fees so that the apartments could discharge flow to the lift station constructed by" Parkwood for the development. The judge also concluded there is no language in the Lift Station Agreement asserting that rebate fees were only to be charged to properties outside the original development that connect to the lift station constructed by Parkwood.

The judge furthered her analysis by looking at language describing the "force main rebate charge" (as opposed to the pump station rebate charge at issue here), and she found significance in the use of "off-site" and "on-site" to describe only the force-main charge (not the pump-station charge). According to that provision, "[c]onnections to the force main at a point located *on* the proposed development property shall pay 50% of the total force main rebate charge," while "[c]onnections to the force main at a point which is located *outside* of the proposed development property shall pay 50% of the off-site force main rebate charge . . . ." (emphases supplied). The judge noted that the contract did not make the same

---

[3] The trial judge included this finding in her final judgment, and the undisputed record evidence supports it.

distinction regarding the pump-station rebate charge—the text referring only to the charge "without any reference to or limitation as to amounts due based upon whether the connection is on-site or off-site."

Ultimately, the judge refused GRU's request that she consider the disputed provisions within the context of the contract's initial paragraphs because they were "prefatory." According to the judge, those paragraphs "may not be relied upon if they will cause ambiguity in an otherwise unambiguous contract," and she had concluded that "the Agreement is unambiguous without looking to the prefatory provisions."

GRU argues that this was error—that the trial judge should have considered the two provisions in the context of the *whole* agreement, of which GRU contends the prefatory paragraphs were a part.

## II

This being a matter of contract interpretation, we consider the question anew, without giving deference to the trial court's assessment of the text. *Cf. City of Leesburg v. Hall*, 117 So. 840, 841 (Fla. 1928) (stating the "well established" rule that "construction of a written contract is a matter of law [to] be determined by the court" rather than by a jury); *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013) (noting that construction of insurance contract "is a question of law subject to de novo review").

Our objective here "is to ascertain the meaning and intent of the parties as expressed in the language used." *Canal Lumber Co. v. Fla. Naval Stores & Mfg. Co.*, 92 So. 279, 284 (Fla. 1922). As mentioned in the beginning, when we do so, we cannot read a textual provision in isolation—something the trial court erroneously did here. *See Allstate Ins. Co.*, 385 So. 3d at 113 ("Provisions in the texts of statutes and contracts cannot be viewed in isolation from the full textual context of which they are a part."); *see also Lab'y Corp. of Am.*, 339 So. 3d at 324 (noting that "a fair reading will always be mindful of the 'fundamental principle . . . of language itself [] that the meaning of a word . . . must be drawn

from the context in which it is used'" (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993))).

As the supreme court has explained:

> The courts have established rules to be observed in the construction of contracts. One requires that the contract should be considered *as a whole* in determining the intention of the parties to the instrument. Another is to the effect that the *conditions and circumstances* surrounding the parties and *the object or objects to be obtained* when executing the contract should be considered. Another is that courts should place themselves, as near as possible, *in the exact situation of the parties to the instrument, when executed*, so as to determine the intention of the parties, *objects to be accomplished*, obligations created, time of performance, duration, consideration, mutuality, and other essential features.

*Fla. Power Corp. v. City of Tallahassee*, 18 So. 2d 671, 674 (Fla. 1944) (emphases supplied); *see also Orlando Orange Groves Co. v. Hale*, 161 So. 284, 294 (Fla. 1935) (noting that the "main principle" in construing a contract is to deduce the intention of the parties "from consideration of the whole instrument").

A couple decades earlier, the court explained this approach a slightly different way, as follows:

> Courts, in other words, are never shut out from the same light enjoyed by the parties when the contract was executed and are accordingly entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and to judge the meaning of words and correct application of the language to the subject-matter. *General or indefinite terms employed in the contract may be thus explained or restricted as to their meaning and application, and the contract as a whole construed to give it such effect, and none other, as the parties intended at the time it was made.*

18

*Holmes v. Kilgore*, 103 So. 825, 827 (Fla. 1925) (emphasis supplied).

In construing the Lift Station Agreement, the trial judge zeroed in on paragraphs nine and ten and expressly read them without considering the prefatory text or the circumstances surrounding the contract's execution. The judge explained in her order that the prefatory text "may not be relied upon if they will cause ambiguity in an otherwise unambiguous contract." This approach incorrectly treated the question of ambiguity as strictly binary—so making the decision whether to look at any other text in the contract at all wholly dependent on whether the text in question, by itself, is ambiguous in the first place. Construction canons are not to operate this way. "Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules," these canons "can aid the interpretive process from beginning to end," so "[i]t would be a mistake to think that . . . interpreters [must] make a threshold determination of whether a term has a 'plain' or 'clear' meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute." *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022); *see Allstate Ins. Co.*, 385 So. 3d at 113 (taking same non-isolation, "full textual context" approach when construing contractual text).

We do not suggest that the prefatory language in the contract could alter GRU's obligations set out in paragraphs nine and ten by giving those paragraphs a meaning that they otherwise could not reasonably bear. *See* SCALIA & GARNER, READING LAW at 218 (explaining how the principle that prefatory language "cannot be invoked when the text is clear" means the language "cannot give words and phrases of the dispositive text itself a meaning that they cannot bear"). But the trial judge cannot pretend that the text is not there. The text is part of the Lift Station Agreement, and both parties are presumed to have read it before signing. The prefatory language here also "does set forth the assumed facts and the purposes that . . . the parties to [the contract] had in mind," thereby "shed[ding] light on the meaning of the operative provisions that follow." *Id.*

19

Following the supreme court's holistic approach just described, we do not determine the clarity of just a few contractual provisions in isolation; rather, we consider the prefatory text—using that text, "along with all other factors"—and *then* "determin[e] *whether* the instrument is clear" in the first place. *Id.* At that point, the prefatory text can help figure out "which of various permissible meanings the dispositive text [more reasonably] bears." *Id.*; *cf. Ross v. Savage*, 63 So. 148, 155 (Fla. 1913) (indicating that contractual text's apparent "definite legal meaning" is not necessarily "presumed" to be what the parties intended if there is a "contrary intention appearing by the instrument"). If we telescope out from just paragraphs nine and ten and consider the prefatory text, we see that "any properties" and "actually connecting" have both a literal meaning (for which Parkwood argues) and a contextual meaning (for which GRU argues)—with the contextual meaning being the more reasonable one.

The term "any properties" necessarily presumes some understood set of properties that could connect to the installed system. The literal meaning, derived from paragraphs nine and ten when considered in isolation, references a set that includes *all* properties that *possibly* could connect that then *actually* do connect. The contextual meaning—derived from considering paragraphs nine and ten alongside the rest of the contract, including the prefatory text—references a *subset* of all those *possible* properties, the subset being limited to those for which the contract appears to have been intended: the "properties outside of the original [Newberry Park] development." At a minimum, the prefatory text gives rise to questioning whether the "dispositive" text is as clear as both Parkwood and the trial judge think it is.

The tip-off that Parkwood's reading might not be the most reasonable is the fact that it would get a rebate for the Newberry Park connections (*i.e.*, connections within Parkwood's planned development), which would have been factored into the 170 ERUs calculated to be that development's own demand from the pump station. In other words, the rebate calculation ($439 per ERC) was based on the lift station's *excess* capacity—303 ERUs, capacity over and above what was needed for Newberry Park. Recall that when Parkwood originally sought approval for the Newberry Park

development, it anticipated 300 residential units.[4] Approval then was conditioned on Parkwood's building infrastructure to allow all those units to tie into GRU's wastewater facilities, after which GRU would provide ongoing service. Parkwood now wants to read the contract to require a rebate of costs associated with the lift station's originally projected base use of 170 ERUs—costs it was required to incur as a condition for approval of the 300 residential units—and to have that money come out of the connection fees paid to GRU by Parkwood's successor upon completion of Newberry Park—fees Parkwood itself would have paid had it not sold the project before it was done (and presumably factored into the price of sale to Newberry Properties). It simply makes no sense that the parties embedded this circularity into the contract.

We must give the Lift Station Agreement's terms "a reasonable interpretation according to the intention of the parties at the time of executing them." *Holmes*, 103 So. at 827. When there is an obscurity, ambiguity, or doubt—such that there are two possible constructions—"one of which makes it fair, customary, and such as a prudent man would naturally execute, while the other makes it inequitable, unnatural, or such as a reasonable man would not be likely to enter into"—we go with "the interpretation

---

[4] Given the two possible meanings here, we have no problem looking to the undisputed record evidence to supply additional context for the contract's language. *Cf. Atlanta & St. A.B. Ry. Co. v. Thomas*, 53 So. 510, 513 (Fla. 1910) (explaining that, in the event of a contract ambiguity requiring resolution, a court may consider "the subject-matter of the contract, the language used, the purpose designed, the consideration furnished, and *the circumstances that induced the making of the contract*" (emphasis supplied)); *see also Fla. Power Corp.*, 18 So. 2d at 674 (noting both the whole-text rule of construction and rule "that the conditions and circumstances surrounding the parties and the object or objects to be obtained when executing the contract should be considered"); *but cf. Knabb v. Reconstruction Fin. Corp.*, 197 So. 707, 715–16 (Fla. 1940) (noting that "extraneous facts" pertaining to the circumstances surrounding the contract's execution and its "apparent purpose" may be considered only when there is doubt as to meaning).

which makes a rational and probable agreement." *Id.*; *see also id.* ("If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted.").

The prefatory language—referencing use by developments beyond the "original" one (*i.e.*, Newberry Park) and "capacity [] available at the time [such] service is required"—points us toward a reading that is much more reasonable. Parkwood would get rebate fees collected from outside developments that use the 303 ERUs in *excess* capacity on its lift station (rather than having to install their own stations)—Parkwood's station having been installed as required to support Parkwood's own planned development, which was projected to need 170 ERUs of the station's 473-ERU capacity. This reading happens to be consistent with Parkwood's anticipated reimbursement from GRU for the oversized piping it installed: the reimbursement being only for the *incremental* cost above what Parkwood was required to incur to support its own development.

Under this reading of the Lift Station Agreement, Parkwood failed to prove a breach that would entitle it to damages from GRU. The parties do not dispute that there have not been any connections to the Parkwood-installed lift station by outside developments—no rebate fees collected from those developments for those connections. The judgment rendered in favor of Parkwood and against GRU for $132,901 lacks legal support. On remand, judgment must be rendered in favor of GRU, dismissing the action with prejudice. *See* Fla. R. Civ. P. 1.420(b) (allowing for a trial court, in an action tried without a jury, to render a judgment of dismissal against "the party seeking affirmative relief" when the party "has shown no right to relief").

. . . .

BILBREY, J., dissenting.

Because the trial court correctly found that the initial language in the contract was prefatory and could not be used to

22

create an ambiguity in the remainder of the contract, I respectfully dissent.[1]

The trial court held that the initial language in the contract was prefatory, stating in the final judgment:

20. Although these paragraphs do not contain "whereas" language, the context indicates that these are indeed prefatory paragraphs as they are at the beginning of the agreement, are set apart from the rest of the contract, do not contain a heading, and do not contain numbers as the other sections of the contract do. The last paragraph of this section states "In consideration of the foregoing and mutual promises set out below the parties agree to the following." *See Johnson v. Johnson*, 725 So. 2d 1209, 1212 (Fla. 3d DCA 1999) (holding that prefatory recitations contained in various "whereas" clauses are not binding, operative provisions to an otherwise unambiguous contract); *Orlando Lake Forest Venture v. Lake Forest Master Community*, 105 So. 3d 646, 648 (Fla. 5th DCA 2013) (holding that whereas clause is prefatory and nonbinding where the agreement is clearly arranged in a manner to separate the recitals from the operative portions, which are expressed in detailed numbered articles).

21. Since the first four paragraphs of the Agreement are prefatory, they may not be relied upon if they will cause ambiguity in an otherwise unambiguous contract. As set forth in the above analysis, the Agreement is unambiguous without looking to the prefatory provisions.

The majority is correct that in interpreting a contract we consider the entire agreement. *See Taylor v. Taylor*, 1 So. 3d 348,

---

[1] As the final judgment on appeal was entered in September 2022, and this case has been at issue before this court since April 2023, I will be brief. Appellee tried to gently nudge us in to action in February 2025 by moving for supplemental briefing. We did not respond to this plea until today, denying the motion in a separate order.

350 (Fla. 1st DCA 2009). But the prefatory clauses at the start of a contract are "not an operative provision of an otherwise unambiguous agreement." *Johnson*, 725 So. 2d at 1212 (citations omitted).[2]

Statutes are interpreted in the same manner as contracts. *Crapo v. Univ. Cove Partners, Ltd.*, 298 So. 3d 697, 700 (Fla. 1st DCA 2020). In construing statutes, the Florida Supreme Court has recognized the limitation of prefatory language stating, "It is well settled that such 'prefatory language' cannot expand or restrict the otherwise unambiguous language of a statute." *Dorsey v. State*, 402 So. 2d 1178, 1180 (Fla. 1981). "Although prefatory language may aid a court to determine legislative intent when the operative terms of a provision of law are ambiguous, such language does not control interpretation of the operative terms of that provision." *Dep't of State v. Florida Greyhound Ass'n, Inc.*, 253 So. 3d 513, 521 (Fla. 2018) (citing *Dorsey*, 402 So. 2d at 1180).

The trial court correctly found that the language at the start of the contract was prefatory, not operative, and could not be used to create an ambiguity where none existed in the body of the contract. I would affirm the well-reasoned judgment of the trial court. Because the majority reverses, I respectfully dissent.

———————————————

Brian W. Franklin, City of Gainesville, Office of the City Attorney, Gainesville, for Appellant.

Elliot B. Kula and W. Aaron Daniel of Kula & Associates, P.A., Miami, for Appellee.

[2] To the extent that there is any conflict between the prefatory language and the operative provisions of the contract, the operative provisions prevail. *See N. Tr. Co. v. King*, 6 So. 2d 539, 540 (Fla. 1942) (citing 17 C.J.S., Contracts, § 314, p. 733) ("The question then arises whether we will be governed by the recital or the operative clause. The law appears settled that where there is a difference in the recital and covenant, the covenant will prevail.").